## STATE OF CONNECTICUT *v.* SANTOS MIRANDA
### (SC 15467)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.

Argued December 2, 1997—officially released June 30, 1998

*Robert J. Scheinblum*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Elpedio Vitale*, assistant state's attorney, for the appellant (state).

*Susan M. Cormier*, with whom was *Bageshree Ranade*, legal intern, for the appellee (defendant).

*Mario T. Gaboury* filed a brief for the Center for the Study of Crime Victims' Rights, Remedies and Resources, University of New Haven, as amicus curiae.

*Opinion*

KATZ, J. The issue in this appeal is whether a person who is not the biological or legal parent of a child but who establishes a familial relationship with a woman and her infant child, voluntarily assumes responsibility for the care and welfare of the child, and considers

himself the child's stepfather, has a legal duty to protect the child from abuse, such that the breach of that duty exposes the person to criminal liability pursuant to General Statutes § 53a-59 (a) (3).[1] After a court trial, the defendant, Santos Miranda, was convicted of six counts of assault in the first degree in violation of § 53a-59 (a) (3),[2] and one count of risk of injury to a child in violation of General Statutes § 53-21.[3] The court concluded that the defendant had established a familial relationship with the victim and her mother, that his failure to help and protect the child from abuse constituted a gross deviation from the standard of conduct that a reasonable person would observe in the situation, and that such reckless conduct resulted in serious physical injuries to the child. The trial court found the defendant not guilty of nineteen counts of assault in the first degree. Those counts had charged him with either personally inflicting the injuries or not preventing the child's mother from inflicting the injuries.[4] The court

[1] General Statutes § 53a-59 provides in relevant part: "Assault in the first degree: Class B felony: Nonsuspendable sentences. (a) A person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

[2] The defendant was convicted of two counts of unspecified reckless conduct, two counts of reckless conduct by allowing the victim to live in a situation of child abuse and two counts of reckless conduct by failing to take measures to prevent the child from living in such a situation.

[3] General Statutes § 53-21 provides: "Injury or risk of injury to, or impairing morals of, children. Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child, shall be guilty of a class C felony."

[4] Although the trial court never stated who actually had caused the injuries, we take judicial notice that the child's mother entered a plea of nolo conten-

imposed a total effective sentence of forty years imprisonment.

The defendant appealed to the Appellate Court, which affirmed the conviction for risk of injury to a child,[5] but reversed the assault convictions concluding that the defendant had no legal duty to act under the circumstances of this case. *State* v. *Miranda*, 41 Conn. App. 333, 341, 675 A.2d 925 (1996). This court granted the state's petition for certification limited to the following issue: "Under the circumstances of this case, did the Appellate Court properly conclude that the defendant could not be convicted of violating General Statutes § 53a-59 (a) (3) because he had no legal duty to protect the victim from parental abuse?" *State* v. *Miranda*, 237 Conn. 932, 677 A.2d 1372 (1996). We conclude that, based upon the trial court's findings that the defendant had established a familial relationship with the victim's mother and her two children, had assumed responsibility for the welfare of the children, and had taken care of them as though he were their father, the defendant had a legal duty to protect the victim from abuse.[6] Accordingly, we reverse the judgment of the Appellate Court.

As set forth in its memorandum of decision, the trial court found the following facts. The defendant commenced living with his girlfriend and her two children

dere to the crimes of intentional assault in the first degree and risk of injury to a minor. She received a sentence of twelve years incarceration suspended after seven years.

[5] The Appellate Court refused to consider the sufficiency of the evidence claim on the risk of injury count on the basis that it had been briefed inadequately. *State* v. *Miranda*, 41 Conn. App. 333, 338, 675 A.2d 925 (1996).

[6] The defendant does not claim on appeal that the trial court's findings of fact were clearly erroneous. See *Crowell* v. *Danforth*, 222 Conn. 150, 156, 609 A.2d 654 (1992) ("The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses." [Internal quotation marks omitted.]). We, therefore, accept those findings for purposes of this appeal.

in an apartment in September, 1992. On January 27, 1993, the defendant was twenty-one years old, his girlfriend was sixteen, her son was two, and her daughter, the victim in this case, born on September 21, 1992, was four months old. Although he was not the biological father of either child, the defendant took care of them and considered himself to be their stepfather. He represented himself as such to the people at Meriden Veteran's Memorial Hospital where, on January 27, 1993, the victim was taken for treatment of her injuries following a 911 call by the defendant that the child was choking on milk. Upon examination at the hospital, it was determined that the victim had multiple rib fractures that were approximately two to three weeks old, two skull fractures that were approximately seven to ten days old, a brachial plexus injury to her left arm, a rectal tear that was actively "oozing blood" and bilateral subconjunctival nasal hemorrhages. On the basis of extensive medical evidence, the trial court determined that the injuries had been sustained on three or more occasions and that none of the injuries had been the result of an accident, a fall, events that took place at the time of the child's birth, cardiopulmonary resuscitation, a blocked air passageway or the child choking on milk. Rather, the trial court found that the injuries, many of which created a risk of death, had been caused by great and deliberate force.

The trial court further found in accordance with the medical evidence that, as a result of the nature of these injuries, at the time they were sustained the victim would have screamed inconsolably, and that her injuries would have caused noticeable physical deformities, such as swelling, bruising and poor mobility, and finally, that her intake of food would have been reduced. The court also determined that anyone who saw the child would have had to notice these injuries, the consequent deformities and her reactions. Indeed, the trial court

found that the defendant had been aware of the various bruises on her right cheek and the subconjunctival nasal hemorrhages, as well as the swelling of the child's head, that he knew she had suffered a rectal tear, as well as rib fractures posteriorly on the left and right sides, and that he was aware that there existed a substantial and unjustifiable risk that the child was exposed to conduct that created a risk of death. The trial court concluded that despite this knowledge, the defendant "failed to act to help or aid [the child] by promptly notifying authorities of her injuries, taking her for medical care, removing her from her circumstances and guarding her from future abuses. As a result of his failure to help her, the child was exposed to conduct which created a risk of death to her and the child suffered subsequent serious physical injuries . . . ."

The trial court concluded that the defendant had a legal duty to protect the health and well-being of the child based on the undisputed facts that he had established a familial relationship with the child's mother and her two children, that he had voluntarily assumed responsibility for the care and welfare of both children, and that he considered himself the victim's stepfather. On the basis of these circumstances, the trial court found the defendant guilty of one count of § 53-21 and six counts of § 53a-59 (a) (3).[7]

I

Before addressing the certified issue of whether the facts and circumstances of this case were sufficient to create a legal duty to protect the victim from parental abuse pursuant to § 53a-59 (a) (3), we turn our attention to the question of whether, even if we assume such a

---

[7] The issue on appeal was limited to the question of whether the defendant had breached a duty to protect the child victim. The parties have raised the issue of whether the evidence was sufficient to support the assault convictions, however, we leave that issue to the Appellate Court on remand.

duty exists, *the failure to act* can create liability under that statute. In other words, by failing to act in accordance with a duty, does a defendant commit a crime, such as assault in the first degree in violation of § 53a-59 (a) (3), that is not specifically defined by statute in terms of an omission to act but only in terms of cause and result?[8] Whether a failure to discharge a legal duty to protect a child constitutes an omission punishable as an assault is a question of law subject to de novo review by this court. *State* v. *Solek*, 242 Conn. 409, 419, 699 A.2d 931 (1997).

The trend of Anglo-American law has been toward enlarging the scope of criminal liability for failure to act in those situations in which the common law or statutes have imposed an affirmative responsibility for the safety and well-being of others. See generally 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.3; annot., 61 A.L.R.3d 1207 (1975); annot., 100 A.L.R.2d 483 (1965). Criminal liability of parents based on a failure to act in accordance with common-law affirmative duties to protect and care for their children is well recognized in many jurisdictions. See, e.g., *People* v. *Stanciel*, 153 Ill. 2d 218, 606 N.E.2d 1201 (1992) (mother guilty of homicide by allowing known abuser to assume role of disciplinarian over child); *Smith* v. *State*, 408 N.E.2d 614 (Ind. App. 1980) (mother held criminally responsible for failing to prevent fatal beating of child by her lover); *State* v. *Walden*, 306 N.C. 466, 293 S.E.2d 780 (1982) (mother guilty of assault for failure to prevent beating); *State* v. *Williquette*, 129 Wis. 2d 239,

---

[8] In recognition of the broad term "engage in conduct," as chosen by the legislature in § 53a-59 (a) (3), suggesting at least the want of due care, the failure to respond and the disregard of responsibility, the defendant does not claim that the plain language of the statute precludes criminal liability from attaching to an omission to act when there is a legal duty to do so. Nor does the defendant challenge the long-standing and fundamental principle that "conduct" can include the failure to act when there is a duty to act. 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.3 (a).

385 N.W.2d 145 (1986) (mother guilty of child abuse for allowing child to be with person known previously to have been abusive and who subsequently abused child again).[9] In light of this duty to protect and care for children, courts in these jurisdictions have concluded that, where this duty exists and injury results, the failure to protect the child from harm will be "deemed to be the cause of those injuries" and the person bearing the duty may face criminal sanctions. *State* v. *Peters*, 116 Idaho 851, 855, 780 P.2d 602 (1989).

Although our research has revealed no case by this court in which we expressly have held a parent criminally liable for failure to act to save his or her child from harm,[10] the Appellate Court has recognized that criminal liability may attach not only to overt acts but also to an omission to act when there is a legal duty to do so. *State* v. *Miranda*, supra, 41 Conn. App. 339; *State* v. *Jones*, 34 Conn. App. 807, 812–13, 644 A.2d

[9] The attempt by Justice Berdon in his dissent to undermine our reliance on these cases in his discussion of whether we can recognize a common-law duty to protect a child from abuse misses their import. Despite the presence of statutes in those cases, the courts address at length the inherent duty of parents to provide for the safety and well-being of their children, noting that this duty has long been recognized by the common law as well as by statute. See, e.g., *State* v. *Walden*, supra, 306 N.C. 475 ("[W]e believe that to require a parent as a matter of law to take affirmative action to prevent harm to his or her child or be held criminally liable imposes a reasonable duty upon the parent. Further, we believe this duty is and has always been inherent in the duty of parents to provide for the safety and welfare of their children, which duty has long been recognized by the common law and by statute."); *State* v. *Williquette*, supra, 129 Wis. 2d 255 ("[i]t is the right and duty of parents under the law of nature as well as the common law and the statutes of many states to protect their children" [internal quotation marks omitted]); id., 260 ("We are unpersuaded that the child abuse reporting statute was intended to relieve parents of their common law duty to protect their children. We construe the statute as creating duties for persons who otherwise had no obligation to protect children because they do not have a recognized special relationship with the child.").

[10] In *State* v. *Tomassi*, 137 Conn. 113, 119, 75 A.2d 67 (1950), this court recognized that an act or omission that causes death may constitute murder or manslaughter.

355, cert. denied, 231 Conn. 909, 648 A.2d 158 (1994) (defendant's failure to call ambulance or seek help for his obviously injured child indicated "conscious disregard of a substantial risk of death" within meaning of § 53a-59 [a] [3]). We agree that criminal conduct can arise not only through overt acts, but also by an omission to act when there is a legal duty to do so. "Omissions are as capable of producing consequences as overt acts. Thus, the common law rule that there is no general duty to protect limits criminal liability where it would otherwise exist. The special relationship exception to the 'no duty to act' rule represents a choice to retain liability for some omissions, which are considered morally unacceptable." *State* v. *Williquette*, supra, 129 Wis. 2d 253. Therefore, had the defendant been the victim's parent—someone with an undisputed affirmative legal obligation to protect and provide for his minor child[11]—we would conclude that his failure to protect the child from abuse could constitute a violation of § 53a-59 (a) (3).

## II

We next turn to the issue of whether the duty to protect can be imposed on the defendant, an adult member of the household unrelated to the child. Both the state and the defendant recognize that the determination of the existence of a legal duty is a question of law subject to de novo review by this court. *Santopietro* v. *New Haven*, 239 Conn. 207, 226, 682 A.2d 106 (1996).

The defendant argues that there is no statutory or common-law precept "authorizing the expansion of assault under § 53a-59 (a) (3)." The state argues that there is both. We conclude that, based on the trial

---

[11] The defendant does not dispute that a parent has a duty to provide for and protect his or her child, but only whether, under the facts and circumstances of this case, he should be treated similarly. See part II of this opinion.

court's findings that the defendant had established a family-like relationship with the mother and her two children, that he had voluntarily assumed responsibility for the care and welfare of both children, and that he had considered himself the victim's stepfather, there existed a common-law duty to protect the victim from her mother's abuse, the breach of which can be the basis of a conviction under § 53a-59 (a) (3). Therefore, we need not decide whether General Statutes §§ 46b-38a, 17a-101 and 17a-103 create an express statutory duty as well.[12]

---

[12] General Statutes § 46b-38a provides: "Family violence prevention and response: Definitions. For the purposes of sections 46b-38a to 46b-38f, inclusive:

"(1) 'Family violence' means an incident resulting in physical harm, bodily injury or assault, or an act of threatened violence that constitutes fear of imminent physical harm, bodily injury or assault between family or household members. Verbal abuse or argument shall not constitute family violence unless there is present danger and the likelihood that physical violence will occur.

"(2) 'Family or household member' means (A) spouses, former spouses; (B) parents and their children; (C) persons eighteen years of age or older related by blood or marriage; (D) persons sixteen years of age or older other than those persons in subparagraph (C) presently residing together or who have resided together; and (E) persons who have a child in common regardless of whether they are or have been married or have lived together at any time.

"(3) 'Family violence crime' means a crime as defined in section 53a-24 which, in addition to its other elements, contains as an element thereof an act of family violence to a family member and shall not include acts by parents or guardians disciplining minor children unless such acts constitute abuse.

"(4) 'Institutions and services' means peace officers, service providers, mandated reporters of abuse, agencies and departments that provide services to victims and families and services designed to assist victims and families."

General Statutes § 17a-101 provides in pertinent part: "Protection of children from abuse. Mandated reporters. Training program for identification and reporting of child abuse and neglect. (a) The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of

There are many statutes that expressly impose a legal duty to act and attach liability for the failure to comply with that duty. See, e.g., General Statutes §§ 14-224 and 14-225. With other statutes, however, the duty to act can be found outside the statutory definition of the crime itself, either in another statute; see, e.g., General Statutes § 12-231 (imposing liability for failure to comply with General Statutes § 12-222); or in the common law. 1 W. LaFave & A. Scott, supra, § 3.3 (a), p. 283.

We note initially that the question of whether a duty, and thus, liability for the breach of that duty, should be recognized in this state is not foreclosed by our penal code. Although this notion "does not appear in haec verba in the penal code, that lacuna is not determinative in this case, because [General Statutes] § 53a-4 of the code provides: 'The provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions.' The official commentary to that provision states: 'The purpose of this savings clause is to make clear that the provisions of [General Statutes §§] 53a-5 to 53a-23, which define the principles of criminal liability and defenses, are not necessarily exclusive. A court is not precluded by sections 53a-5 to 53a-23 from recognizing other such principles and defenses not inconsistent therewith.' Commission to Revise the Criminal Statutes,

suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family. . . ."

General Statutes § 17a-103 provides: "Reports by others. Any person other than those enumerated in subsection (b) of section 17a-101 having reasonable cause to suspect or believe that any child under the age of eighteen is in danger of being abused, or has been abused or neglected, as defined in section 46b-120, may cause a written or oral report to be made to the Commissioner of Children and Families or his representative or a law enforcement agency. The Commissioner of Children and Families or his representative shall use his best efforts to obtain the name and address of a person who causes a report to be made pursuant to this section."

Penal Code Comments, Conn. Gen. Stat. Ann. (West 1985) § 53a-4, p. 196." *State* v. *Walton*, 227 Conn. 32, 44–45, 630 A.2d 990 (1993).

We do not believe that the principle of imposing a common-law duty in and of itself is inconsistent with any other principle of criminal liability provided in the code. "Failure to act when there is a special relationship does not, by itself, constitute a crime. The failure must expose the dependent person to some proscribed result. The definition of proscribed results constitutes the substantive crime, and it is defined in the criminal code. The rule regarding omissions, therefore, is not inconsistent with [the penal code]." *State* v. *Williquette*, supra, 129 Wis. 2d 254.[13] Nor does the plain language of § 53a-59

---

[13] Although there is no relevant legislative history illuminating whether a person who voluntarily assumes responsibility for and stands in a particular status relationship to a child may be prosecuted under § 53a-59 (a) (3), "[i]n the absence of guidance from the language of the statute or the legislative history, we look to common law principles . . . . It is assumed that all legislation is interpreted in light of the common law at the time of enactment." (Internal quotation marks omitted.) *Hunte* v. *Blumenthal*, 238 Conn. 146, 153, 680 A.2d 1231 (1996). Section 53a-4 expressly authorizes judicial application of common-law principles of criminal liability that are not expressly included in the penal code where, as here, such application does not otherwise conflict with our penal statutes. See *State* v. *Walton*, supra, 227 Conn. 44.

In his dissent, Justice Berdon accuses us of " 'fashion[ing] additional substantive offenses,' " which the penal code precludes. Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 1994) § 53a-4, p. 223. Were we to fashion a truly separate and distinct substantive offense, such as those recently under consideration by the legislature; see Substitute House Bill No. 6967 (1997), entitled "An Act Concerning Child Abuse"; Substitute House Bill No. 5283 (1998), entitled "An Act Concerning Facilitation of Abuse of a Child"; the dissent's accusations could be viewed with more legitimacy. That is not, however, what this case is about. This case presents an issue, albeit of first impression, whether, under very specific facts, to recognize a common-law duty to protect a child from abuse, and whether the breach of that duty is conduct that falls within an existing statute. If the dissent were correct, even a parent with an undisputed duty to protect a child from abuse could not be held liable under § 53a-59 (a) (3). Rather than usurping a legislative function, we merely recognize a long-standing principle of criminal liability that there are certain crimes that

(a) (3) preclude criminal liability from attaching to an omission to act when a legal duty to act exists and injury results. See footnote 8 of this opinion. The issue, therefore, is whether the principle should be recognized as a matter of policy under the circumstances of this case. We conclude that, under the facts of this case, it is appropriate to recognize an affirmative duty to act and to impose criminal liability for the failure to act pursuant to that duty.

" 'Duty is a legal conclusion about relationships between individuals, made after the fact . . . . The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual.' " *Clohessy* v. *Bachelor*, 237 Conn. 31, 45, 675 A.2d 852 (1996). Although one generally has no legal duty to aid another in peril, even when the aid can be provided without danger or inconvenience to the provider, there are four widely recognized situations in which the failure to act may constitute breach of a legal duty: (1) where one stands in a certain relationship to another; (2) where a statute imposes a duty to help another; (3) where one has assumed a contractual duty; and (4) where one voluntarily has assumed the care of another. 1 W. LaFave & A. Scott, supra, § 3.3 (a) (1)–(4), pp. 284–87.[14] The state argues that this case falls within both the first and fourth situations, or some combination thereof.

---

may be committed either by affirmative action or by the failure to act under circumstances giving rise to a legal duty to act. See 1 W. LaFave & A. Scott, supra, § 3.3 (e), p. 294.

[14] A leading case first outlining these four situations added a requirement to the fourth that appears to have been omitted in recent years. See *Jones* v. *United States*, 308 F.2d 307, 310 (D.C. App. 1962) ("where one has voluntarily assumed the care of another and *so secluded the helpless person as to prevent others from rendering aid*" [emphasis added]). This refinement would not seem applicable to an infant, or for that matter a child of tender years, because a child is *always* dependent on others for care and intervention when sick or in danger.

We begin with the duty based upon the relationship between the parties. One standing in a certain personal relationship to another person has some affirmative duties of care with regard to that person. "Legal rights and duties . . . may arise out of those complex relations of human society which create correlative rights and duties the performance of which is so necessary to the good order and well-being of society that the state makes their observance obligatory." Annot., supra, 100 A.L.R.2d 488.

It is undisputed that parents have a duty to provide food, shelter and medical aid for their children and to protect them from harm. See *In re Juvenile Appeal (Docket No. 9489)*, 183 Conn. 11, 15, 438 A.2d 801 (1981). "The inherent dependency of a child upon his parent to obtain medical aid, i.e., the incapacity of a child to evaluate his condition and summon aid by himself, supports imposition of such a duty upon the parent." *Commonwealth* v. *Konz*, 498 Pa. 639, 644, 450 A.2d 638 (1982). Additionally, " '[t]he commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.' " *In re Adoption of Webb*, 14 Wash. App. 651, 653, 544 P.2d 130 (1975). Indeed, the status relationship giving rise to a duty to provide and protect that has been before the courts more often than any other relationship and, at the same time, the one relationship that courts most frequently assume to exist without expressly so stating, is the relationship existing between a parent and a minor child.

In addition to biological and adoptive parents and legal guardians, there may be other adults who establish

familial relationships with and assume responsibility for the care of a child, thereby creating a legal duty to protect that child from harm. See, e.g., *Cornell* v. *State*, 159 Fla. 687, 32 So. 2d 610 (1947) (grandmother guilty of manslaughter in death of grandchild where she had assumed care of child but became so intoxicated that she allowed child to smother to death). "Recognizing the primary responsibility of a natural parent does not mean that an unrelated person may not also have some responsibilities incident to the care and custody of a child. Such duties may be regarded as derived from the primary custodian, i.e., the natural parent, or arise from the nature of the circumstances." *People* v. *Berg*, 171 Ill. App. 3d 316, 320, 525 N.E.2d 573 (1988); see 1 W. LaFave & A. Scott, supra, § 3.3 (a), p. 286 ("if two people, though not closely related, live together under one roof, one may have a duty to act to aid the other who becomes helpless").

Most courts deciding whether, under a particular set of facts, liability for an omission to act may be imposed under a statute that does not itself impose a duty to act, have looked to whether a duty to act exists in another statute, in the common law or in a contract. 1 W. LaFave & A. Scott, supra, § 3.3 (a), p. 283. Of those courts acting outside the context of a statutory or contractual duty that have held a defendant criminally liable for failing to protect a child from injury, most have relied on a combination of both the first and fourth situations described by Professors LaFave and Scott to establish a duty as the predicate for the defendant's conviction. More specifically, these courts have examined the nature of the relationship of the defendant to the victim and whether the defendant, as part of that relationship, had assumed a responsibility for the victim.[15] We find the reliance by these courts on this combination of factors persuasive.

---

[15] As we have stated, some courts in other jurisdictions have held that liability can flow from the breach of a duty created by contract; see, e.g.,

In *People* v. *Salley*, 153 App. Div. 2d 704, 544 N.Y.S.2d 680 (1989), the court examined the issue of whether the defendant, a woman who was living with a man named Taylor and Kenneth, a three year old who was the son of Taylor's estranged wife and another man, as well as five other children, was guilty of manslaughter in the second degree for failing to secure medical attention for Kenneth, who was being physically abused by Taylor. Taylor had inflicted approximately seventy bruises on Kenneth and Kenneth died from a combination of a fracture, internal bleeding and various wounds to his body. Because the defendant "had assumed the parental obligations of care for Kenneth," and had been aware of and consciously disregarded the substantial and unjustifiable risk of his death in failing to get Kenneth help during the time he was being abused by Taylor, the court concluded that she properly could be convicted of manslaughter. Id., 705.

In *State* v. *Orosco*, 113 N.M. 789, 833 P.2d 1155 (1991), the court examined whether the defendant, who lived with the victim and his mother and who failed to intervene when one of his friends sexually abused the victim, could be held criminally liable for the abuse. Relying on *State* v. *Walden*, supra, 306 N.C. 466, the court held that, by assuming the care and welfare of the child, the defendant stood in the position of a parent.[16] *State* v. *Orosco*, supra, 796.

---

*Commonwealth* v. *Pestinikas*, 421 Pa. Super. 371, 617 A.2d 1339 (1992) (because there was evidence that victim's death had been caused by appellant's failure to provide food and medical care that he had agreed by oral contract to provide, omission to act was sufficient to support conviction for criminal homicide); *Davis* v. *Commonwealth*, 230 Va. 201, 335 S.E.2d 375 (1985) (defendant guilty of involuntary manslaughter in death by starvation and exposure of his elderly mother, where defendant breached implied contract to care for mother, in return for which he was allowed to live in mother's home and share her social security benefits). The state is not relying on that theory as a basis for conviction and, therefore, we express no opinion as to whether that relationship can serve as a theory of liability.

[16] As an additional basis for its decision, the court reasoned that the defendant's failure to protect the child could be regarded by the attacker

In *Leet* v. *State*, 595 So. 2d 959 (Fla. App. 1991), the court examined whether the defendant could be held criminally responsible for abuse of a child by his mother although he was not the child's father. The statute at issue required the state to prove "[w]hoever . . . by culpable negligence, deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment, or who, knowingly or by culpable negligence, inflicts or permits the infliction of physical or mental injury to the child . . . ." Id., 961. Despite the broad language of the statute imposing liability on "whoever," the court discussed at length the nature of the defendant's relationship with the child victim, and his assumption of responsibility for the child's care and held that, because the defendant had "assumed responsibility for [the child's] well-being when he established a family-like relationship with [the child] and his mother," he could be held responsible for permitting the child's abuse by his mother. Id., 962–63. Although the defendant had argued that he was not financially responsible for the child and could not have authorized his medical treatment, the court, nevertheless, concluded that he had the authority, and indeed, the duty to prevent the mother's conduct. Id.

In *People* v. *Wong*, 182 App. Div. 2d 98, 588 N.Y.S.2d 119, rev'd on other grounds, 81 N.Y.2d 600, 619 N.E.2d 600, 601 N.Y.S.2d 440 (1993), the court examined whether the defendants, who had been babysitters for the child victim's parents, could be convicted of manslaughter for harming the child and for failing to provide him with necessary medical care. To support a conviction based upon their failure to provide medical attention, the prosecution relied on two theories: (1) that the defendants had contracted with the child's parents to care for the child while the parents worked; and (2)

as support of the abusive conduct and, therefore, made him an aider and abettor.

that the defendants voluntarily had assumed care for the child. Id., 108. The court embraced both theories, recognizing that the voluntary assumption of care, as well as a contractual babysitting agreement, were sufficient to trigger a legal duty. Id. The court concluded that by assuming care for the child, the defendants created a legal duty "substantially coextensive with those which would be borne by a parent . . . ." (Citations omitted.) Id. Although the New York Court of Appeals reversed the conviction of the defendants due to insufficient evidence, it nevertheless endorsed the state's theory of prosecution as "legally sound." *People* v. *Wong*, supra, 81 N.Y.2d 607.

As these cases demonstrate, the traditional approach in this country is to restrict the duty to save others from harm to certain very narrow categories of cases. We are not prepared now to adopt a broad general rule covering other circumstances.[17] We conclude only that, in accordance with the trial court findings, when the defendant, who considered himself the victim's parent, established a familial relationship with the victim's mother and her children and assumed the role of a father, he assumed, under the common law, the same legal duty to protect the victim from the abuse as if he were, in fact, the victim's guardian. Under these circumstances, to require the defendant as a matter of law to take affirmative action to prevent harm to the victim or be criminally responsible imposes a reasonable duty.[18] That duty does not depend on an ability to

---

[17] Many other countries have adopted a more inclusive view in determining what classes of persons shall have a duty to rescue another from harm when they can do so without unreasonable risk to themselves. See J. Dawson, "Negotiorum Gestio: The Altruistic Intermeddler," 74 Harv. L. Rev. 1073, 1101–1106 (1961); see also L. Frankel, "Criminal Omissions: A Legal Microcosm," 11 Wayne L. Rev. 367, 368–69 (1965).

[18] Because, as the trial court found, the defendant "failed to act to help or aid [the child] by promptly notifying authorities of her injuries, taking her for medical care, removing her from her circumstances and guarding her from future abuses," we need not decide whether one or more of these

regulate the mother's discipline of the victim or on the defendant having exclusive control of the victim when the injuries occurred. Nor is the duty contingent upon an ability by the state or the mother to look to the defendant for child support.[19] Moreover, whether the defendant had created a total in loco parentis relationship with the victim by January, 1993, is not dispositive of whether the defendant had assumed a responsibility for the victim. *Leet* v. *State*, supra, 595 So. 2d 962. "If immediate or emergency medical attention is required from a child's custodian it should not matter that such custodian is not the primary care provider or for that matter a legally designated surrogate." *People* v. *Berg*, supra, 171 Ill. App. 3d 320 (wherein court concluded that although defendant had duty as "any person" under child endangerment statute based upon evidence that he lived with victim and her mother, would play with victim, feed and clothe her, discipline her and take her places, under circumstances of case there was insufficient evidence that defendant had endangered victim's health by not obtaining medical treatment).

Nor should we reject the concept of a duty in this case because the defendant might not have been able to authorize medical treatment for the victim had he taken her to the hospital. The status required to impose the legal duty to safeguard the victim is not coextensive with the status that permits one to authorize treatment. Quite obviously, had the defendant brought the victim to the hospital at any time throughout the four month period during which she was abused by her mother, a physician would have had the ability to examine and treat her, and the costs would be paid by her parent,

---

measures would have been sufficient to shield the defendant from liability under § 53a-59 (a) (3).

[19] Certainly, if the defendant had been the biological father of only one of the two children, it would be absurd to suggest that he would have had an obligation to stop the mother from abusing one of the children but not the other.

guardian or the state, if necessary. "Any physician examining a child with respect to whom abuse is suspected shall . . . have the right to keep such child in the custody of a hospital . . . and . . . perform diagnostic tests and procedures necessary to the detection of child abuse with or without the consent of his parents, guardian or other person having responsibility for his care . . . . The expenses for such temporary care and such diagnostic tests and procedures shall be paid by the parents or guardian of such child or, if they are unable to pay, by the commissioner of children and families." General Statutes (Rev. to 1995) § 17a-101 (d).[20]

Finally, we recognize the continuing demographic trend reflecting a significant increase in nontraditional alternative family arrangements. United States Bureau of the Census, Marital Status and Living Arrangements: March 1984, Current Population Reports, Series p-20, No. 399 (1985). Consequently, more and more children will be living with or may depend upon adults who do not qualify as a natural or adoptive parent. The attachment by children to the adults who care for them does not, however, depend exclusively upon whether the caregiver is the natural or adoptive parent or another person who has assumed the caretaker role. Children become attached to people who care for them, and this attachment is "rooted inevitably in the infant's inability to ensure his own survival . . . ." J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child (1973) p. 18. To distinguish among children in deciding which ones are entitled to protection based upon whether their adult caregivers have chosen to

---

[20] This provision was deleted in 1996 and was replaced by General Statutes § 17a-101f. Public Acts 1996, No. 96-246, §§ 1, 8. The current provision permits the commissioner of children and families to recover the cost of treatment "from the parent if the parent has been found by a court to have abused or neglected such child." General Statutes § 17a-101f.

have their relationships officially recognized hardly advances the public policy of protecting children from abuse.

The defendant acknowledges that he could not simply close his eyes to evidence of the brutality the child suffered and that his failure to protect her was punishable under § 53-21.[21] Moreover, he contends that "the risk of injury statute implements the state's public policy of protecting the health and welfare of children and imposes a specific criminal penalty for failure to provide such protection," by punishing *any person* who causes or permits a child to be placed in such a situation that the life or limb of that child is endangered. Nevertheless, the defendant argues that although he had a duty under § 53-21, he did not have a duty under § 53a-59 (a) (3).[22] The logic of his argument is flawed. Indeed, it is well established that this court will look to other relevant statutes governing the same or similar subject matter because the legislature is presumed to have created a consistent body of law. *Daly* v. *DelPonte*, 225 Conn. 499, 510, 624 A.2d 876 (1993). Therefore, as to the issue

---

[21] Additionally, the defendant points to the risk of injury statute to argue that the legislature already criminalizes his conduct and that, therefore, § 53a-59 (a) (3) should not be read to apply to that same conduct. This court has rejected the notion that merely because one criminal statute covers certain conduct it is therefore exclusive. *State* v. *Perruccio*, 192 Conn. 154, 162, 471 A.2d 632, appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984). Furthermore, we have held that "where the elements of two or more distinct offenses are combined in the same act, prosecution for one will not bar prosecution for the other." *State* v. *Chetcuti*, 173 Conn. 165, 169, 377 A.2d 263 (1977).

[22] The defendant attempts to distinguish some of the cases cited by the state and referenced in this opinion because they involve child endangerment statutes that resemble § 53-21. See, e.g., *Leet* v. *State*, supra, 595 So. 2d 959; *People* v. *Berg*, supra, 171 Ill. App. 3d 316. This argument is misplaced. Although the courts in those cases were deciding whether the defendant could be criminally liable for child endangerment, and although the statutes held responsible "whoever" had failed to act, the courts, nevertheless, first examined whether the defendant had a duty vis-a-vis the child. Therefore, their discussion of when a duty should be imposed is pertinent.

of duty, because § 53-21, without any explicit restriction, holds responsible *any person* who permits abuse of a child to occur, to prescribe a duty in connection with § 53a-59 (a) (3) to prevent such abuse furthers "a harmonious and consistent body of law" as opposed to antagonizing legislative intent.[23] We conclude that the defendant had a duty, under the facts and circumstances of this case, to protect the victim and prevent further harm to her, and that for violating that duty to her, he can be found guilty of having violated § 53a-59 (a) (3).[24]

[23] Although today we decline the state's invitation to decide whether the defendant had an express statutory duty pursuant to §§ 17a-101, 17a-103 and 46b-38a to protect the victim in this case, we nevertheless appreciate the important public policy of protecting children from abuse and neglect as set forth in those statutes. The legislature has specifically recognized that "family violence crimes" are not confined to family members but may also involve unrelated household members; General Statutes § 46b-38a; and expressly stated that the public policy of the state is to "protect children whose health and welfare may be adversely affected through injury and neglect . . . and to make the home safe for children . . . ." General Statutes (Rev. to 1995) § 17a-101. Moreover, there is an express duty on all persons "having reasonable cause to suspect or believe that any child under the age of eighteen is in danger of being abused or neglected . . . [to] immediately cause a written or oral report to be made to the state commissioner of children and families . . . . Any such person who in good faith makes the report . . . shall be immune from any liability, civil or criminal . . . ." General Statutes (Rev. to 1995) § 17a-103. Imposing a common-law legal duty on the defendant in this case is consistent with the legislature's creation of a legally cognizable relationship, advances its express public policy to protect children and fosters the notion that ultimate responsibility for a child's safety transcends biology.

[24] In his dissent, Justice Berdon relies heavily upon the introduction of the facilitator abuse statute; Substitute House Bill No. 5283, § 1 (a) (1998) (H.B. No. 5283); and on the legislature's failure ultimately to enact that statute to support the proposition that the assault statute, § 53a-59 (a) (3), does not punish the defendant's behavior. The dissent maintains that H.B. No. 5283 would not have been introduced if the legislature thought that § 53a-59 (a) (3) could be used to punish behavior similar to that prohibited by H.B. No. 5283. The dissent also claims that the bill was not acted upon by the judiciary committee, at least in part, because the behavior punishable by the facilitator abuse statute was already prohibited by § 53-21, the risk of injury statute. In addition to the fact that these theories are diametrically opposed, this reliance on legislative silence is misplaced.

The judgment of the Appellate Court is reversed and the case is remanded to that court for consideration of the defendant's remaining claims.[25]

In this opinion CALLAHAN, C. J., and BORDEN and NORCOTT, Js., concurred.

It is a basic tenet of statutory construction that we rely on the intent of the legislature as that intent has been *expressed. Connecticut Light & Power Co.* v. *Walsh,* 134 Conn. 295, 301, 57 A.2d 128 (1948) ("we are confined to the intention which is expressed in the words [the legislature] has used"); see *Madison Education Assn.* v. *Madison,* 174 Conn. 189, 192, 384 A.2d 361 (1978). There has been no affirmative expression of legislative intent linking the failure to enact the facilitator abuse statute to § 53a-59 (a) (3). As the dissent acknowledges, the judiciary committee took no action on H.B. No. 5283 and the dissent points to no affirmative statement indicating the reason for this inaction. "Ordinarily, we are reluctant to draw inferences regarding legislative intent from the failure of a legislative committee to report a bill to the floor, because in most cases the reasons for that lack of action remain unexpressed and thus obscured in the mist of committee inactivity." *In re Valerie D.,* 223 Conn. 492, 518 n.19, 613 A.2d 748 (1992).

Although we have relied on the failure to *amend* a statute as an indication of legislative intent regarding that statute or statutes within the same legislative scheme; see, e.g., *Anderson* v. *Ludgin,* 175 Conn. 545, 555, 400 A.2d 712 (1978); cf. *State* v. *McVeigh,* 224 Conn. 593, 619–21, 620 A.2d 133 (1993) (subsequent amendments held not relevant to legislative intent at time of enactment of underlying statute); we hesitate unilaterally to assign motives to the legislature where it has failed to *enact* a statute other than the one whose interpretation is before us. Cf. *In re Valerie D.,* supra, 223 Conn. 517–18 (noting significance of legislature's failure to pass one of two alternative provisions covering the same subject matter upon which simultaneous hearings were held). As a corollary to that principle, we likewise hesitate to derive legislative intent from the mere introduction of a bill and from committee hearings on that bill. Committee hearings provide a useful laboratory in which to explore new legislative approaches. To rely on dialogue between interested members of the public would place a high cost on the dynamic nature of the legislative process and unnecessarily chill the introduction of bills and discourse attendant thereto. Finally, the fact that the state and the dissent have suggested opposing theories to explain the legislature's failure to enact H.B. No. 5283 best illustrates that one guess is as good as the other, and is the epitome of why we cannot engage in this kind of speculation.

[25] The defendant has argued that he did not actually know that the child had been abused by her mother and that knowledge of her injuries should not be equated with knowledge of their cause. He also argues that there was no evidence that he had the ability to prevent any harm from occurring to the child. Those claims of insufficiency of evidence are to be considered

PALMER, J., with whom MCDONALD, J., joins, concurring. I join the opinion of the majority. A serious question remains, however, as to whether the defendant, Santos Miranda, had fair warning that his failure to act, in the particular circumstances of this case, could give rise to the crime of assault in the first degree in violation of General Statutes § 53a-59 (a) (3). The legal duty that we recognize today has never before been expressly recognized in this state; indeed, the Appellate Court, upon consideration of the defendant's appeal, unanimously concluded that no such duty existed. *State v. Miranda*, 41 Conn. App. 333, 340–41, 675 A.2d 925 (1996). In such circumstances, it is by no means clear that the due process clauses of the federal and state constitutions permit such a duty to be imposed on this defendant for purposes of criminal liability under the assault statute.[1] See, e.g., *United States* v. *Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) ("[T]he canon of strict construction of criminal statutes . . . ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly

on the merits by the Appellate Court on remand. See footnote 7 of this opinion. We note that the attorney who represented the defendant before the Appellate Court was placed on inactive status in June, 1997. As a result, following the granting of certification by this court, in order to ensure that the defendant be properly represented, the trial court ordered the appellate unit of the office of the chief public defender to assign the case to new appellate counsel in order to represent the defendant in the certified appeal. Attorney Susan M. Cormier entered an appearance on behalf of the defendant and currently represents him in this appeal. Under the unique circumstances of this case, in the exercise of our supervisory authority, we order that the Appellate Court consider, on the merits, any constitutional claims of due process and double jeopardy arising as a result of this decision that appellate counsel seeks to raise. Finally, in light of the problems experienced by the defendant's initial appellate counsel, we also order that current appellate counsel be permitted to rebrief the issue of sufficiency of the evidence as it relates to the risk of injury charge. See footnote 5 of this opinion.

[1] There is, of course, a difference between the recognition of an existing duty, on the one hand, and the creation of an altogether new duty, on the other. Whether that distinction is significant for due process purposes under the specific facts of this case remains to be seen.

covered. . . . [A]lthough clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute . . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope . . . ." [Citations omitted.]); *Bouie* v. *City of Columbia*, 378 U.S. 347, 354–55, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964) ("[w]hen a[n] . . . unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime"); *State* v. *Webb*, 238 Conn. 389, 531, 680 A.2d 147 (1996) (vagueness doctrine "requires statutes to provide fair notice of the conduct to which they pertain . . . so that an individual may steer between lawful and unlawful conduct" [citation omitted; internal quotation marks omitted]). Since the defendant will have the opportunity to raise a due process claim on remand, however;[2] see footnote 25 of the majority opinion; and because I agree with the analysis and conclusions of the majority, I join the opinion of the majority.

MCDONALD, J., concurring and dissenting in part. I concur with the result reached by the majority. I do so because the Appellate Court, in reversing the assault convictions, simply held that the defendant, Santos Miranda, was not the biological or legal parent of the victim and, therefore, owed no legal duty to protect

---

[2] The importance of this issue to the defendant cannot be overstated in view of the fact that he received a cumulative sentence of thirty years imprisonment on the six counts of assault in the first degree. Because the defendant also received a consecutive ten year prison term on the one count of risk of injury to a child, his total effective sentence is forty years imprisonment. By contrast, the child's mother, who, it appears, actually caused the child's injuries, received a total effective sentence of only seven years imprisonment. See footnote 4 of the majority opinion.

her. *State* v. *Miranda*, 41 Conn. App. 333, 340–41, 675 A.2d 925 (1996). The Appellate Court should have considered the circumstances of the case[1] in deciding the issue of legal duty. See *Clohessy* v. *Bachelor*, 237 Conn. 31, 45, 675 A.2d 852 (1996).

If the adult defendant was having a continuous intimate relationship with the victim's mother who was raising the newborn child in their household, then the defendant would have a duty to prevent, if he could, the ongoing abuse in the household of the helpless victim of which he was aware. See 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.3 (a), p. 286. Although the defendant was not related to anyone in the household by marriage, biology or adoption, his cohabitation with the victim's mother created a relationship with that responsibility. Many children currently live in households founded by unmarried couples. Excusing those who do not marry from such responsibility discriminates against marriage, upon which "society may be said to be built"; *Reynolds* v. *United States*, 98 U.S. 145, 165, 25 L. Ed. 244 (1879); and "without which there would be neither civilization nor progress"; *Maynard* v. *Hill*, 125 U.S. 190, 211, 8 S. Ct. 723, 31 L. Ed. 654 (1888); and does so to the peril of our children.

I do not agree, however, that the first degree assault statute should be applied to this case without more clarification. The existence of a duty to protect against

---

[1] There is, however, considerable confusion as to the factual circumstances. The premise of the Appellate Court's decision and of the certified issue was that the victim was being abused by her mother. This is, however, not borne out in the trial court's findings. The defendant was acquitted of nineteen counts of assault in the first degree charging him with having failed to prevent the mother from abusing the victim, or having himself injured the victim. The defendant was convicted of six counts of assault in the first degree, including two counts of unspecified reckless conduct, two counts of reckless conduct by allowing the victim to live in a situation of risk of repeated assault, and two counts of reckless conduct by failing to take measures to prevent the victim from living in such a situation.

serious physical injury in the household and the application of that duty under the assault statute depends upon the circumstances of the case, the relationship of the parties, the harm the statute protects against and the conduct prohibited by the penal statute. It is one thing to recognize that a stepparent is duty-bound to stop the abuse of a helpless child in his or her home and extend that role to the live-in boyfriend or girlfriend. It is quite another to decide that a caregiver with a family-like relationship may be convicted of first degree assault because that caregiver fails to seek medical aid or report suspected child abuse to the authorities.

Whether one who does not personally inflict the physical injury may be held liable under the assault statute for failure to seek medical treatment and whether a worsening of the victim's condition because of that failure is required, whether a failure to report continuing abuse may support liability for assault, and whether this doctrine should be restricted to cases of child abuse are questions I believe we must address.[2]

As Justice Palmer and Justice Berdon point out, liability for assault, absent accessorial liability, where the

---

[2] In *People* v. *Miranda,* 204 App. Div. 2d 575, 612 N.Y.S.2d 65 (1994), the Supreme Court of New York, Appellate Division, reinstated those counts of an indictment charging the defendant mother with assault in the first degree for "failure to obtain medical care for [her infant child] or other nonfeasance contributing to the assaults . . . ." Id. The Appellate Division cited *People* v. *Wong,* 81 N.Y.2d 600, 619 N.E.2d 377, 601 N.Y.S.2d 440 (1993), in which it was alleged, in connection with a child's death, that the defendants' failure to seek medical care after the child's injury was inflicted resulted in the child's death. See id., 607. The court's theory of criminal liability in *Wong* was that a "passive" defendant could be found guilty of an offense under § 15.10 of the New York Penal Law. Id. "Under . . . § 15.10, an individual's criminal liability may be predicated on an 'omission.' " Id. New York's penal law defines "omission" as "a failure to perform an act as to which a duty of performance is imposed by law." N.Y. Penal Law § 15.00 [3] (McKinney 1998); see also *People* v. *Steinberg,* 79 N.Y.2d 673, 680, 595 N.E.2d 845, 584 N.Y.S.2d 770 (1992). Our penal code, however, contains no like provisions respecting omissions except as to criminal attempt under General Statutes § 53a-49.

trauma causing the physical injury is inflicted by an unknown party, is, to say the least, a "novel construction" of the assault statute. Cf. *Bouie* v. *City of Columbia*, 378 U.S. 347, 353–55, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964). I therefore join Justice Palmer's concurrence with respect to the due process concerns regarding notice, also alluded to in part V of Justice Berdon's dissent.

I should also add that I have doubts concerning the validity of the multiple punishments imposed on the assault counts. Some of those punishments were for multiple counts based on the same injury and for multiple violations of one statute based on the same conduct.

In footnote 25 of the majority opinion, the court's order of remand allows the defendant to broaden his claims on appeal. I concur in that order of remand and would expand it to include the issues raised in this concurring opinion.

BERDON, J., dissenting. Cases, such as the one before us, that present revolting facts concerning the physical abuse of a four month old child, test the foundation of our democracy. The rule of law must be upheld even when confronted with alarming allegations of improper acts, indeed allegations of loathsome conduct on the part of the defendant. The question for this court, in cases such as this, is whether the legislature intended to make the conduct with which the defendant was charged criminal under General Statutes § 53a-59 (a) (3), assault in the first degree. It is not whether this court, were it sitting as a legislature, would have proscribed the conduct at issue. "Such action by a legislature may well be commendable, but by a court condemnable." *State* v. *Williquette*, 129 Wis. 2d 239, 263, 385 N.W.2d 145 (1986) (Heffernan, C. J., dissenting). Simply put, we cannot craft a substantive offense ex post facto in order to include conduct that we find

abhorrent to our sensitivities and that of the general public. It is this judicial restraint that sharply puts into focus one of the essential differences between democratic and totalitarian forms of government.

The facts of this case, as they pertain to the issues before us, are as follows: The trial court concluded that the defendant, Santos Miranda, was guilty of six counts of assault in the first degree in violation of § 53a-59 (a) (3), not because he physically abused the child, nor because he aided in the abuse of the child, but, rather, as a result of the following: (1) that he lived with the physically abused child and the child's mother in the same household as a "live-in boyfriend"; (2) that he established a "family-like" relationship with the child— he considered himself her stepfather and he took care of her like a father; and (3) that he was aware of the child's injuries but failed to notify the authorities, failed to obtain medical treatment for her, failed to remove her from the circumstances and failed to guard her from future abuse.[1] The Appellate Court reversed the defendant's assault convictions, holding that the "failure to act when one is under no legal duty to do so, thereby permitting a dangerous condition to exist, is not sufficient to support a conviction for assault in the first degree pursuant to § 53a-59 (a) (3)." *State* v. *Miranda*, 41 Conn. App. 333, 338–39, 675 A.2d 925 (1996). I agree with the Appellate Court.

I

The majority's determination that the facts in this case were sufficient to create a legal duty on the part of the defendant to protect the child from parental

---

[1] "The defendant was charged with twenty-five counts of assault in the first degree. He was found not guilty of the remaining nineteen counts, all of which charged him with having either personally inflicted the victim's injuries, or having aided and abetted another in inflicting those injuries." *State* v. *Miranda*, 41 Conn. App. 333, 334 n.1, 675 A.2d 925 (1996).

abuse pursuant to § 53a-59 (a) (3) is premised on its unsupported conclusion that had the defendant been the victim's parent, he would have had an undisputed affirmative legal obligation to protect the child from assault pursuant to § 53a-59 (a) (3). There is an affirmative obligation on the defendant and the parent, under the circumstances of this case, to protect the child, but that duty does not arise under § 53a-59 (a) (3). Rather, in this state, the obligation to act arises under General Statutes § 53-21, entitled "[i]njury or risk of injury to, or impairing the morals of, children,"[2] which was enacted by the legislature many years ago to address the failure to act with respect to the welfare of a child. This court made it clear, in State v. Perruccio, 192 Conn. 154, 159, 471 A.2d 632, appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984), that the proscription of § 53-21 included "deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . ." (Internal quotation marks omitted.) Here, the trial court found the defendant guilty of risk of injury with respect to the child, for which he was sentenced to the maximum term of ten years.

The defendant's conviction under § 53-21, however, is not before us.[3] What is before this court on appeal from the Appellate Court is the following certified issue: "Under the circumstances of this case, did the Appellate Court properly conclude that the defendant could not be convicted of violating General Statutes § 53a-59 (a)

---

[2] See footnote 3 of the majority opinion for the text of § 53-21.

[3] The Appellate Court refused to review the claim that there was insufficient evidence to support a conviction under § 53-21 because it was "inadequately briefed." State v. Miranda, supra, 41 Conn. App. 338. This court refused to grant certification to appeal that issue. See State v. Miranda, 237 Conn. 932, 677 A.2d 1372 (1996). I agree with the majority that, in the interests of justice, on remand all the claims of insufficiency of evidence and any constitutional claims, including due process and double jeopardy, may be raised by the defendant's appellate counsel.

(3) because he had no legal duty to protect the victim from parental abuse?" *State* v. *Miranda*, 237 Conn. 932, 677 A.2d 1372 (1996).

## II

The majority addresses an issue that is necessarily implied in the certified question—that is, whether the "conduct" referred to in § 53a-59 (a) (3) includes the failure to act. I disagree with the majority's very tenuous argument that it does. Section 53a-59 (a) provides in part that "[a] person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ." Although "conduct" can include the failure to act under circumstances when there is a duty to act; 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.3., p. 282; the majority points to nothing in the text of § 53a-59 (a) (3), or its legislative history, to support its conclusion that conduct under § 53a-59 (a) (3) includes the failure to act. In fact, both the common definition of assault—"a violent attack with physical means"; Webster's Third New International Dictionary; and the legal definition of assault— "[a]ny wilful attempt or threat to inflict injury upon the person of another"; Black's Law Dictionary (6th Ed. 1990); belie the majority's claim.

Moreover, by construing § 53a-59 (a) (3) to include the duty to act, the majority stands a long-standing and fundamental principle of statutory construction on its head: Penal statutes "are to be expounded strictly against an offender, and liberally in his favor. This can only be accomplished, by giving to them a literal construction, so far as they operate penally . . . ." *Daggett* v. *State*, 4 Conn. 60, 63 (1821). Indeed, what this court stated in *State* v. *Cataudella*, 159 Conn. 544, 271 A.2d

99 (1970), is applicable to this case. "A statute imposing a penalty should receive a strict construction in favor of those who might be subject to its provisions. [N]o act should be held to be in violation . . . which does not fall within its spirit and the fair import of its language. *Morin* v. *Newbury*, 79 Conn. 338, 340, 65 A. 156 [1906]; *State* v. *Faro*, 118 Conn. 267, 273, 171 A. 660 [1934]; *State* v. *Parker*, 112 Conn. 39, 46, 151 A. 325 [1930]; *Hartford-Connecticut Trust Co.* v. *O'Connor*, 137 Conn. 267, 274, 76 A.2d 9 [1950]. While a criminal statute is not to be defeated by an unreasonably strict construction of its language, it must be rather strictly construed so that the conduct made criminal will be ascertainable with reasonable certainty from a careful reading of the statute. A corollary to this is the rule that the meaning of a penal statute cannot be extended by presumption or intendment. *State* v. *Zazzaro*, 128 Conn. 160, 167, 20 A.2d 737 [1941]. *State* v. *Benson*, 153 Conn. 209, 215–16, 214 A.2d 903 [1965]." (Internal quotation marks omitted.) *State* v. *Cataudella*, supra, 555–56; *State* v. *Smith*, 194 Conn. 213, 221–22 n.7, 479 A.2d 814 (1984) ("[c]riminal convictions will be upheld only when the defendant's behavior is clearly forbidden by the statute under which he or she has been prosecuted"). A careful reading of § 53a-59 (a) (3) would never lead a rational reader to believe that a person was subject to criminal liability under the statute for the failure to act—whether the person is a stranger, a live-in boyfriend, or a parent.

Furthermore, the majority mistakenly relies on the Appellate Court's decision in this case and in *State* v. *Jones*, 34 Conn. App. 807, 812–13, 644 A.2d 355, cert. denied, 231 Conn. 909, 648 A.2d 158 (1994), to support its claim that the failure to act is included in "conduct" under § 53a-59 (a) (3). The Appellate Court in this case did not hold that "conduct" in § 53a-59 (a) (3) included

the omission to act; rather, it merely stated that "conduct, creating criminal liability, may be by an act or an omission to act *if within the intendment of the statute*." (Emphasis added.) *State* v. *Miranda,* supra, 41 Conn. App. 339. The Appellate Court in this case concluded, as I do, that § 53a-59 (a) (3) does not include the "omission to act." In *State* v. *Jones,* supra, 812, the Appellate Court did not specifically determine that the defendant's failure to act—that is, the failure to call an ambulance when the defendant knew his child was injured—constituted criminal "conduct." Rather, the Appellate Court in *Jones* affirmed the trial court's finding that the defendant's act of violently shaking and subjecting the child to a sudden impact was conduct that justified his conviction under § 53a-59 (a) (3).[4] Id.

### III

Nevertheless, even if the majority were correct that one person can assault another person under § 53a-59 (a) (3) by failing to act, the defendant's conviction in this case cannot stand. By superimposing on § 53a-59 (a) (3) a common-law duty on the part of a person to act in order to protect a child from harm when that third person voluntarily assumes responsibility for the care and the welfare of the child and considers himself to have a stepfather-stepchild relationship with the child, the majority has created *a new crime.* See Black's Law Dictionary (6th Ed. 1990) ("[a] crime may be defined to be an act done in violation of those duties which an individual owes to the community, and for the breach of which the law has provided that the offender shall make satisfaction to the public"); see also 1 W. LaFave & A. Scott, supra, § 1.2, pp. 8–16. In crafting this new crime, the majority ignores the fact that it is the legislature that defines substantive crimes. This division between the legislature and the court was

---

[4] See footnote 11 of this dissent.

established in 1971 when the legislature adopted the penal code and repealed General Statutes (Rev. to 1968) § 54-117,[5] which recognized common-law crimes.[6] See Public Acts 1969, No. 828, §§ 1 et seq. and 214.

---

[5] General Statutes (Rev. to 1968) § 54-117 provides: "In case of conviction for any high crime or misdemeanor at common law, or of assault with intent to kill, the offender may be imprisoned not more than fifteen years or be fined not more than five hundred dollars or both, and, in case of conviction for any other offense at common law, the offender may be imprisoned not more than one year or be fined not more than three hundred dollars or both."

[6] The majority claims in footnote 13 of its opinion that it is not creating a substantive offense, but merely interpreting § 53a-59 (a) (3). Incredibly, in the same footnote, the majority concedes that it is recognizing "a common-law duty to protect a child from abuse . . . ." Indeed, Justice Palmer, in his concurring opinion, concedes that "the legal duty that [the majority recognizes] today has never before been expressly recognized in this state . . . ." By imposing this common-law duty, the majority crafts a new crime.

The majority posits that "[i]f the dissent were correct, even a parent with an undisputed duty to protect a child from abuse could not be held liable under § 53a-59 (a) (3)." That is absolutely correct—even a parent could not be held liable under § 53a-59 (a) (3) for failing to protect his or her own child. See part IV of this dissent (legislative history fails to support claim that failure to act on part of parent is conduct proscribed under § 53a-59 [a] [3]); J. Bruckmann, G. Nash & J. Katz, Connecticut Criminal Caselaw Handbook: A Practitioner's Guide (1989) p. 494 (accused may be charged only with those crimes that are cognizable under statutory law); see *State v. Beccia*, 199 Conn. 1, 5, 555 A.2d 683 (1986) (same). The parent, as well as the defendant in this case, however, could be found criminally liable under § 53-21 of causing injury or risk of injury to, or impairing the morals of children, and the defendant was in fact convicted of that crime. See part I of this dissent.

Even if the majority is correct that it is merely interpreting § 53a-59 (a) (3) in accordance with our common law, its reasoning is flawed. The majority is unable to point to any common law in this state that would provide for criminal liability under § 53a-59 (a) (3) or any other assault statute for the failure to protect a child from abuse. See part IV of this dissent. The majority looks for support in 1 W. LaFave & A. Scott, supra, § 3.3, concerning the "omission to act," and ignores the authors' predicate in § 3.3 (a): "For criminal liability to be based upon the failure to act it must first be found that there is a duty to act—a legal duty and not simply a moral duty." Id., p. 283. In fact, § 3.3 is peppered with references to cases in other jurisdictions that have rejected expanding legal duty to conform to moral duty because there was no statutory authority imposing a duty to act. "Generally one has no legal duty to aid another person in peril, even when that aid can be rendered without danger or inconvenience to himself." Id., p. 284; see, e.g.,

Notwithstanding the legislature's clear intention of stripping this court of authority to define substantive crimes, the majority interprets General Statutes § 53a-4, entitled "Saving clause," and the official commentary to § 53a-4, as giving it jurisdiction to create the new crime of assault by a third party for failing to protect a child from abuse. In doing so, the majority grossly misinterprets § 53a-4, and ignores the final, and most critical, sentence in the commentary. Section 53a-4 provides: "The provisions of [chapter 951] shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions." Chapter 951 of the General Statutes, of which § 53a-4 is a part, does

*State* v. *Ulvinen*, 313 N.W.2d 425, 428 (Minn. 1981) (defendant was under no legal duty to warn daughter-in-law that defendant's son was planning to kill her, no matter how morally reprehensible failure to do so was).

Furthermore, the cases from other jurisdictions that the majority cites are not germane. For example, two of the jurisdictions cited by the majority as imposing an affirmative obligation on parents to protect their children from abuse do so pursuant to statutory authority. In *State* v. *Williquette*, supra, 129 Wis. 2d 242 and n.1, the Wisconsin Supreme Court held that a mother who took no action to stop the known abuse of her children by their father could be held criminally liable under a statute in effect at the time, entitled "Abuse of children," which provided: "Whoever . . . *subjects* a child to cruel maltreatment . . . is guilty of a Class E felony." (Emphasis added.) Wis. Stat. § 940.201. That statute was subsequently repealed and replaced by the current statute, Wis. Stat. § 948.03 (1995). Moreover, in *Smith* v. *State*, 408 N.E.2d 614, 619 (Ind. App. 1980), the Indiana Court of Appeals held that a mother who knowingly left her child with a person who repeatedly hit the child could be held criminally liable under the Indiana statute entitled "Neglect of a dependent," which provided in relevant part: "(a) A person having the care, custody, or control of a dependent who . . . knowingly . . . . (1) Places the dependent in a situation that may endanger his life or health . . . commits neglect of a dependent . . . ." Ind. Code § 35-46-1-4 (Sup. 1979). In *State* v. *Walden*, 306 N.C. 466, 473–76, 293 S.E.2d 780 (1982), the only case the majority cites in which a defendant was found guilty of assault for failing to prevent abuse in the absence of statutory imposition of a duty to act, the North Carolina Supreme Court's holding was based on a theory of accessory liability, not a common-law duty to act under an assault statute. With respect to accessory liability, the trial court in the present case specifically found the defendant not guilty. See footnote 1 of this dissent.

not define substantive crimes such as imposing new obligations, rather, it provides for principles of liability, such as the mental state required in General Statutes § 53a-5, and the liability for aiding in the criminal acts of another in General Statutes § 53a-8. The commentary to § 53a-4 that the majority conveniently omits underscores the prohibition as follows: "This does not mean, however, that the court is free to fashion additional substantive offenses, for the [penal code] precludes, by repealing section 54-117, the notion of common law crimes." Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 1994) § 53a-4, p. 223.

The opinion of this court in *State* v. *Walton*, 227 Conn. 32, 630 A.2d 990 (1993), illuminates the majority's misinterpretation of § 53a-4. In *Walton*, this court adopted the *Pinkerton*[7] principle of liability—that is, "a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." Id., 43. The majority in *Walton* first explained that it was "not fashion[ing] an additional substantive offense by applying *Pinkerton* to the facts of [that] case . . . [because] [t]he *Pinkerton* principle does not create a substantive offense; it applies a particular principle of vicarious criminal liability to an appropriate case." Id., 45 n.11. The court in *Walton* then explained that it could recognize the *Pinkerton* principle because it "has roots in our state jurisprudence." Id., 48. The "application of the *Pinkerton* principle to a homicide committed in furtherance of a conspiracy has . . . been part of our jurisprudence [since 1945]. See, e.g., *State* v. *Young*, 191 Conn. 636, 642, 469 A.2d 1189 (1983); *State* v. *McCarthy*, 133 Conn.

---

[7] *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

171, 173, 49 A.2d 594 (1946); *State* v. *Rossi*, 132 Conn. 39, 44, 42 A.2d 354 (1945)."[8] *State* v. *Walton,* supra, 50–51. Finally, the *Walton* court concluded that it could recognize the *Pinkerton* principle because it was not "inconsistent with the notion of accessory liability" found in § 53a-8. Id., 52.

The majority argues that it may recognize a duty to protect a child from abuse under § 53a-59 (a) (3) because it is merely applying a long-standing principle of liability consistent with the principles of liability permitted by § 53a-4. Even if we assume that it is merely applying a principle of liability rather than creating a substantive crime, the majority, however, unlike the court in *Walton,* fails to cite any cases in which this court has applied this principle of liability for acts of omission.[9] Moreover, the majority makes no attempt to explain why the "principle of imposing a common-law duty" to protect a child from abuse is not inconsistent with the principles of liability set forth in chapter 951 of the penal code. Indeed, the majority ignores the fact that the recognition of this new duty under § 53a-59 (a) (3) is inconsistent with the notion of accessory liability in § 53a-8. For example, this court consistently has held that one cannot be held liable under a theory of aiding and abetting, for merely being present at the time of the crime and acquiescing to the commission of the

---

[8] "Indeed, even prior to *Pinkerton,* [this court] had employed a rule of vicarious criminal liability under which a coconspirator could be held liable for a murder if that crime was the natural and probable consequence of a common plan and was committed while acting in pursuance of, or in further-ance of, the common design. . . . *State* v. *Cots,* 126 Conn. 48, 59, 9 A.2d 138 (1939)." (Internal quotation marks omitted.) *State* v. *Diaz,* 237 Conn. 518, 529, 679 A.2d 902 (1996).

[9] In the one case the majority does refer to, *State* v. *Tomassi,* 137 Conn. 113, 119, 75 A.2d 67 (1950), this court stated in dicta that an act or omission that causes death may constitute murder or manslaughter. In *Tomassi,* the court's affirmance of the defendant's conviction was based on the fact that the defendant wilfully shot and wounded the victim, not on an omission of care by the defendant. Id.

crime. See, e.g., *State* v. *Pundy*, 147 Conn. 7, 11, 156 A.2d 193 (1959) ("[m]ere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the one who commits the crime must be distinguished from the criminal intent and community of unlawful purpose shared by one who knowingly and wilfully assists the perpetrator of the offense in the acts which prepare for, facilitate, or consummate it"); *State* v. *Thomas*, 105 Conn. 757, 762, 136 A. 475 (1927) (same); *State* v. *Enanno*, 96 Conn. 420, 425, 114 A. 386 (1921) (same). Therefore, § 53a-4 precludes the majority from recognizing this new duty to protect a child from abuse.

## IV

The legislature will be very much surprised to discover that we have in place, under § 53a-59 (a) (3), a law that provides that the failure to act is punishable criminal conduct. Although the legislature recently has grappled with the issue of imposing an affirmative obligation on the part of a parent and an unrelated adult to protect children from abuse; see Substitute House Bill No. 5283 (1998) (H.B. No. 5283), entitled "An Act Concerning Facilitation of Abuse of a Child";[10] it did not enact the proposed legislation. Nevertheless, the majority of this court, without any understanding of the implications of its decision today and without the aid of expert advice that is available to the legislature through the public hearing process, impetuously and presumptuously crafts a crime of assault that was never

---

[10] The select committee on children issued a favorable report on H.B. No. 5283 to the judiciary committee. The judiciary committee took no action on H.B. No. 5283 and, as of this date, the bill remains dormant.

Substitute House Bill No. 5283, § 1 (a) provides: "A person is guilty of facilitation of abuse of a child when, as a parent, guardian or caretaker of a child, such person fails to act to protect the child from death or serious physical injury by another person under circumstances where there is a continuing course of abusive conduct and the parent, guardian or caretaker reasonably should have known of such conduct."

intended by the legislature. Clearly, if the legislature agreed with the majority that, pursuant to § 53a-59 (a) (3), parents as well as unrelated adults had an affirmative legal obligation to protect children from abuse, it never would have had a need to consider H.B. No. 5283, a bill that explicitly criminalizes the conduct with which the defendant was charged in the present case.[11]

The representatives of several state agencies and several non-profit groups created to support victims of

[11] At oral argument in the present case, the state argued that the legislature's decision not to consider the select committee on children's proposed amendment to House Bill No. 6967 in 1997, entitled "An Act Concerning Reporting of Child Abuse," does not prove that the legislature questions whether § 53a-59 (a) (3) imposes a duty on parents and unrelated adults to protect children from abuse. According to the state, "[i]t is at least plausible that our legislature rejected [the facilitator abuse amendment] because [1] it was aware of the common-law rule that an adult [who] voluntarily assumes care and responsibility for a helpless child he or she lives [with] has a duty to protect that child from abuse, or [2] it's own express public policy of protecting children from abuse and neglect and making the homes safe for children, or [3] the fact that [that] certified question is presently pending before this court."

The detailed record of the select committee on children's public hearing with respect to child abuse—including H.B. No. 5283—disproves each of the state's contentions at oral argument. First, if the legislature agreed that § 53a-59 (a) (3) imposed on persons a duty to protect children from abuse, it would not have considered imposing on parents and certain unrelated adults the same duty to act pursuant to H.B. No. 5283. Second, the legislators who spoke at the public hearing made it clear that, despite the state's express public policy of protecting children from abuse and neglect and making homes safe for children, the legislature needed to create a new statutory duty for parents and certain unrelated adults to protect children from abuse. See Conn. Joint Standing Committee Hearings, Select Committee on Children, Pt. 1, 1998 Sess., p. 35, remarks of Representative Nancy E. Kerensky (legislature should enact H.B. No. 5283 in order to make "a statement about what parental obligations are in view of this legislature *from this point on*" [emphasis added]); id., p. 46, remarks of Representative Paul M. Tymniak ("[W]e still have children turning up dead. I think we have to go someplace different in trying to address it."); id., p. 33, remarks of Representative Mary M. Mushinsky ("the present law doesn't seem to be working to the members of this committee"). Third, this court may "presume that the legislature is aware of [the Appellate Court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpreta-

abuse spoke out against H.B. No. 5283 at the public hearing before the legislature's select committee on children. The remarks of these speakers set forth several significant reasons why this court should not undertake the legislative function and declare by judicial fiat that, "as a matter of policy under the circumstances of this case," the defendant in this case had an affirmative legal obligation under § 53a-59 (a) (3) to protect the child from abuse.[12]

First, those who testified before the committee expressed unanimous concern that holding persons liable for not protecting children from abuse actually would cause more harm than it would prevent. They testified that if the legislature wants to accomplish its goal of preventing children from being injured as a result of violence, it must first consider ways to improve the delivery of services to at risk families under the state's present child welfare system. For example, Diane Edell, program director of the Aetna Foundation

tion." *Ralston Purina Co.* v. *Board of Tax Review,* 203 Conn. 425, 439, 525 A.2d 91 (1987).

[12] Paul Robinson, in his article entitled "Criminal Liability for Omissions: A Brief Summary and Critique of the Law in the United States," 29 N.Y.L. Sch. L. Rev. 101, 104 (1984), also points out several reasons why the issue of imposing affirmative legal obligations on persons to protect children from abuse is best left for the legislature. "There is a general, albeit declining, reluctance in the United States to impose affirmative duties and to punish nonperformance of those duties. Various explanations for the reluctance to criminalize inactivity have been offered. First, there is difficulty in defining with sufficient clarity the effort that must be expended in order to satisfy the duty. Second, the inherent ambiguity in defining the scope of a duty leads to speculation about guilt and thereby poses a threat to society more serious than the harm prevented by requiring affirmative conduct. Third, because 'prevailing attitudes draw sharp distinctions between overt action and passivity[, the] legislature cannot ignore the mores, nor should it implement them beyond necessary limits.' Finally, a governmental demand to perform is significantly more intrusive than a command to refrain from harmful action and therefore must be justified by a significant overriding public interest and must be imposed in a way that minimizes the extent of intrusion." Id.

Children Center at Saint Francis Hospital and Medical Center, testified that "[t]his law . . . will [not] do anything to protect children. There are other things . . . prevention programs, specialized mental health programs, helping mothers to leave abusive relationships that will help us help our children better." Conn. Joint Standing Committee Hearings, Select Committee on Children, Pt. 1, 1998 Sess., p. 56.

Furthermore, several speakers testified that, if the legislature imposed liability on persons who fail to protect a child from abuse, it would discourage persons who are in the best position to know whether a child has been abused from informing the appropriate authorities after the abuse occurs. See id., p. 64, remarks of Frederick Berrien, medical director of the Children's Advocacy Center; id., p. 78, remarks of Raphael Podolsky, an attorney for the Legal Assistance Resource Center of Connecticut, Inc. "If we want to help these children we need to find ways to make these parents stronger, not create laws that will result in fewer parents coming forward with their suspicions." Id., p. 56, remarks of Edell, program director of the Aetna Foundation Children Center at Saint Francis Hospital and Medical Center. Finally, according to chief public defender Gerard A. Smyth, H.B. No. 5283 would "discourage people from acting as 'caretakers' " of children, and, consequently, would affect the level of care received by children in this state. Id., p. 3 of Smyth's prepared statement.

Second, nearly every speaker at the public hearing before the select committee on children testified that the legislature did not need to enact H.B. No. 5283 because "the situation that [it] is intended to address is already covered by" § 53-21, the risk of injury to a child statute. Id. According to Smyth, Podolsky, Jessica Stevens, director of the state chapter of the National Organization for Women, Linda Pearce Prestley, child advocate for the state of Connecticut, Gail Burns Smith,

the executive director of Connecticut Sexual Assault Crisis Services, Inc., and Kristine D. Ragaglia, commissioner of the department of children and families, § 53-21 can and should be used to prosecute parents and others who fail to protect children from abuse. See id., p. 3 of Smyth's prepared statement, pp. 72, 51, 9, 42, and p. 2 of Ragaglia's prepared statement.

Third, the speakers at the public hearing before the select committee on children agreed that, even if the committee approved H.B. No. 5283, the bill would have to be made more specific in order to set forth the effort that must be extended to satisfy the duty to protect children from abuse. According to Smyth, for example, it was unclear whether parents, guardians and caretakers could satisfy the duty established in H.B. No. 5283, to act to protect such child from physical abuse, by reporting a risk of abuse to the department of children and families; or whether such persons would be required "[t]o take more active measures, such as concealing a child from a custodial parent if necessary . . . [o]r . . . withholding a child from a parent suspected of abuse." Id., p. 1 of Smyth's prepared statement.

Clearly, all of these delineated issues are best left for the legislature's consideration, not ours. See *Mahon* v. *Heim*, 165 Conn. 251, 257, 332 A.2d 69 (1973) ("the adoption of . . . [a] specific exception [to the standard of care applicable to the conduct of minors, holding them to the adult standard of care when they engage in activities which are potentially highly hazardous] is . . . one peculiarly appropriate for further legislative consideration and action rather than for implementation by judicial fiat").

V

Finally, in crafting this new common-law crime, the majority acknowledges constitutional problems in attempting to apply it in this case. For example, the

majority has created an ex post facto law in its classic sense. *State* v. *Ross*, 230 Conn. 183, 281–82, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) ("[t]he prohibition of ex post facto laws forbids the enactment of any law which imposes a punishment for an act which was not punishable at the time it was committed" [internal quotation marks omitted]). Moreover, even if the new law is not ex post facto, it cannot be applied to the defendant in the present case because a fundamental requisite of due process is that a person must be put on notice, before the alleged commission of a crime, that such nonfeasance is criminal. *United States* v. *Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) ("due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope"); *Grayned* v. *Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) (statute must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited"); *State* v. *McGann*, 199 Conn. 163, 177, 506 A.2d 109 (1986) ("[w]hen a[n] . . . unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime" [internal quotation marks omitted]). Furthermore, there is at least a question as to whether the defendant's convictions for assault and risk of injury violate the constitutional prohibition against double jeopardy. J. Bruckmann, G. Nash & J. Katz, Connecticut Criminal Caselaw Handbook: A Practitioner's Guide (1989) p. 151 (where multiple charges are considered same, judgment of conviction may not be entered on both). These constitutional claims, however, will be raised before the Appellate Court. See

*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see also *State* v. *Indrisano*, 228 Conn. 795, 800, 640 A.2d 986 (1994).

I would affirm the judgment of the Appellate Court. Accordingly, I dissent.