OPINION OF THE COURT
Titone, J.
Defendants Eugene Wong and Mary Wong were charged *604 with homicide and endangering the welfare of a child as a result of the death of a three-month-old infant who had been entrusted to their care. There was evidence at trial that both defendants were continuously present in the couple’s apartment and that one of them had shaken the infant violently enough to produce fatal injuries. However, because neither defendant gave a complete account of what had occurred and, apart from the Wongs’ three-year-old son, there were no other witnesses, the People were unable to prove which defendant had administered the fatal shaking. The issue before us on this appeal from the judgment convicting both defendants of second degree manslaughter and endangering the welfare of a child is whether the People’s case, as submitted to the jury, provided a sufficient factual basis for holding the defendant who had not shaken the infant as culpable for the infant’s death as was the defendant who had actually committed the abusive acts. Under the circumstances of this case, we hold that the evidence offered against these defendants was legally insufficient to support the sole theory the People now advance to justify their conviction.
According to the evidence offered at trial, defendants had been retained to care for the three-month-old infant, KwokWei, as a result of an advertisement they had placed in a local Chinese-language newspaper. The infant’s parents, the Jiangs, both worked some 12 hours a day from Monday through Saturday and for that reason felt that they needed the 24-hour care that defendants were offering. The Jiangs were told that defendant Mary Wong would be providing much of their baby’s care but that her husband, defendant Eugene Wong, would also be tending to Kwok-Wei’s needs. Kwok-Wei was to sleep in a crib that was placed directly next to defendants’ bed, which was located in the bedroom of their one-bedroom apartment. The Jiangs planned to visit their child on Sundays, their one day off from work.
The Jiangs’ first visit with Kwok-Wei on July 3, 1988 was uneventful. Four days later, however, defendant Mary Wong called the baby’s father at about 6:30 a.m. and informed him that Kwok-Wei was dead. Ms. Wong told Jiang that the baby had cried continually from about midnight to about 2:00 a.m. on the previous night, that he had been given some "gripe water” obtained from a Chinese pharmacy, that everyone in the household had subsequently gone to sleep and, finally, that when defendants awoke they found that the baby had "turned black.” According to police department records, defen *605 dant Eugene Wong placed a "911” call at approximately the same time, requesting an ambulance for an "unconscious” child.
The police officers who responded to this call immediately noticed that defendants were fully dressed and appeared calm. Upon looking around the room, they saw the already dead infant lying in a baby carrier. The child’s face was discolored and his limbs were stiff and flexed in conformance to the shape of the carrier.
After the police’s arrival, defendants made additional, somewhat inconsistent statements about the events of the preceding night. Defendant Eugene Wong told the paramedics at the hospital that the baby had not been sick and had quieted down after he and his wife had fed him at 1:00 or 2:00 A.M. Wong also told the attending physician that the baby had awakened at about midnight and cried for about hours, during which time both he and his wife "attended the baby to see what was wrong.” According to Wong, Kwok-Wei eventually went to sleep and nothing else occurred until he was checked the next morning, at which point one of the Wongs observed that he was not breathing and had no heartbeat.
While she was at the hospital, Mary Wong asked a police officer whether the child had died and was informed that he had. Nonetheless, she then called Kwok-Wei’s father at the officer’s request and, in response to Jiang’s expressions of disbelief, told him she did not know whether his child was really dead. Several hours later, she spoke to Kwok-Wei’s mother, telling her that the child had fallen asleep at about 2:00 or 2:30 a.m. after having cried for two hours and having refused milk and water. Although Wong initially told the infant’s mother that Kwok-Wei had not appeared to be ill, she stated in a subsequent conversation that the child had had "cramps” and had been "shaking involuntarily.” Wong attributed these symptoms to the mother’s prior use of birth control pills or Chinese herbal medicine.
An autopsy performed on the child revealed that he had died as a result of internal brain injuries, including ruptured blood vessels, that could only be attributed to "shaken baby syndrome.” That condition occurs when an infant under the age of one is subjected to violent shaking causing his or her head to snap back and forth. Under those conditions, the infant’s brain, which is very soft, will move around inside the head, leading to ruptured blood vessels, hemorrhaging and swelling.
*606 "Shaken baby syndrome” is not necessarily accompanied by external injuries. A baby suffering from the effects of a violent shaking would initially cry sharply and then, within about 30 minutes, lapse into a coma that would resemble ordinary sleep to a person who was not watching for the movements that naturally occur during sleep. According to the People’s experts, prompt medical attention can prevent fatality in cases such as Kwok-Wei’s, although serious permanent injuries, including blindness and intellectual impairment, are almost inevitable.
On the basis of the foregoing evidence, both defendants were indicted and tried on charges of first and second degree manslaughter (Penal Law § 125.15 [1]; § 125.20 [1]) and endangering the welfare of a child (Penal Law § 260.10 [1]). After the People’s direct case was presented to the jury, counsel for both defendants moved to dismiss on the ground that the proof had not established that either Eugene Wong or Mary Wong was the person who had caused the infant’s fatal injuries. The prosecutor argued, in response, that the People’s case rested on the theory that each defendant was independently liable for Kwok-Wei’s death because one of them had shaken the baby while the other had stood by and failed to intervene. According to the People’s theory, the defendant who had not actually shaken the infant, the "passive” defendant, was equally culpable because of his or her omission in failing to fulfill a duty that was imposed by law.
The trial court adopted the People’s argument and declined to dismiss the indictment. The court subsequently charged the jury that it could find the "passive” defendant guilty for failing to act if it determined that that defendant "had a duty to prevent another from harming the infant” or to obtain "proper and prompt medical care” and, having had the requisite mental state, had failed in the performance of that duty despite having had the ability to act. The jury returned a guilty verdict on all counts against each defendant.
On defendants’ appeal, the Appellate Division modified by dismissing the convictions for first degree manslaughter on the ground that the finding that defendants had acted, or failed to act, with the "intent to cause serious physical injury” (see, Penal Law § 125.20 [1]) was against the weight of the evidence. The Court, however, rejected the contention that the People’s failure to adduce evidence identifying the. person who had actually shaken the baby vitiated the entire prosecution. *607 Instead, over a vigorous dissent, the Court ruled that the convictions for second degree manslaughter and endangering the welfare of a child were sustainable because there was sufficient evidence to support a finding that the "passive” defendant had failed to perform a duty imposed by law under any one of a number of diverse theories.
On this appeal, the People have limited their case to a single theory. Eschewing several of the theories advanced by the Appellate Division majority, the People now argue only that the convictions of both defendants should be upheld because there was sufficient evidence for the jury to infer that "one of them shook the baby violently while the other, aware of the harm being done, failed to seek medical assistance.” We agree that the People’s formula could theoretically support convictions in a proper case. We conclude, however, that in this case the evidence adduced at trial simply does not provide a sufficient factual basis for finding the "passive” defendant guilty of committing second degree manslaughter by an act of omission. Accordingly, although one of the defendants could properly have been found guilty of second degree manslaughter by shaking Kwok-Wei to death, the convictions of both defendants must now be reversed because there was no evidence tending to show which of the two accused individuals was the abusive actor.
Initially, we note that the People’s theory against the "passive” defendant is legally sound. Under the Penal Law § 15.10, an individual’s criminal liability may be predicated on an "omission.” The "minimal” statutory requirement for criminal liability is "conduct which includes a voluntary act or the omission to perform an act which [the accused] is physically capable of performing” (id.). An "omission” is defined as "a failure to perform an act as to which a duty of performance is imposed by law” (id., § 15.00 [3]).
In People v Steinberg (79 NY2d 673, 680), this Court held that parents have an affirmative duty to provide their children with adequate medical care and that, under certain circumstances, the failure to perform that duty can form the basis of a homicide charge (see also, People v Flayhart, 72 NY2d 737). Defendants do not dispute that the same principle may fairly be applied to situations such as this, where adults other than the parents have undertaken by contract to provide 24-hour custodial care for a very young and helpless child and those adults have the physical capacity to take the *608 necessary steps to secure any required medical care. Thus, where the requisite proof is present, a person in the position of the "passive” defendant here may be held criminally liable for failing to seek emergency medical aid for a seriously injured child, and the only remaining question is whether the People produced the necessary proof in this case.
Before discussing the merits of that issue, we must make brief mention of the proper standard for review in a case such as this, where the evidence against the accuseds is wholly circumstantial. In that situation, the People are obliged to prove the accused’s guilt to "a moral certainty” and the defendant is entitled to a jury instruction, in words or substance, to that effect (People v Daddona, 81 NY2d 992). On an appeal to the Court of Appeals, however, the proper standard of review is whether the evidence before the jury was legally sufficient to support a finding of guilt beyond a reasonable doubt. The phrase "proof to a moral certainty” is simply "a description of the standard to be applied by the fact finder * * * in the more complex and problematical reasoning process necessarily undertaken in cases of purely circumstantial evidence” (People v Barnes, 50 NY2d 375, 380-381; see also, People v Deegan, 69 NY2d 976, 979 ["the standard that every hypothesis but guilt be excluded to a 'moral certainty’ is to be applied only by the trier of fact”]; but cf, People v Cleague, 22 NY2d 363). Once the fact finder has made its determination, the "question of law” within this Court’s limited power to review the validity of a guilty verdict is whether the evidence, viewed in the light most favorable to the People, could lead a rational trier of fact to find the elements of the crime to have been proven beyond a reasonable doubt (People v Foster, 64 NY2d 1144, 1146; see, People v Bleakley, 69 NY2d 490, 495; see also, Jackson v Virginia, 443 US 307, 319). With that standard in mind, we turn to the evidence adduced at defendants’ trial.
Manifestly, the "passive” defendant’s "mere presence” in the Wongs’ apartment at the time of the crime is insufficient to support a finding of criminal liability (see, e.g., People v Sanchez, 61 NY2d 1022). The People’s contention that the "passive” defendant is criminally liable for failing to seek medical help for Kwok-Wei after he was violently shaken requires, at the very least, a showing both that the "passive” defendant was personally aware that the shaking had occurred and that such abusive conduct created a risk that the infant would die without prompt medical treatment.
The second prong of this required showing is plainly proble *609 matic in this case. In People v Steinberg (supra, at 681), we observed that, even where the accused has no medical training, "there are situations where the need for prompt medical attention would be obvious to anyone — a child bleeding profusely, for example.” Whether that was the case here presents a close question, particularly since the shaking to which Kwok-Wei was subjected produced no external bruises and the symptoms of the internal injuries he sustained could be mistaken for indicia of ordinary sleep.
Even if we were to resolve this question by holding that a rational fact finder could have determined the issue in the People’s favor, the People could not prevail because of the absence of proof from which the jury could infer that the "passive” defendant was even aware that the infant had been violently shaken. As to this critical element of their theory, the People rely almost exclusively on defendants’ own statements that they had been awake and tending to the child together during the 2 Vi-hour period when the shaking probably occurred. However, this evidence is simply too tenuous a thread to support the weight of the all-important inference of knowledge on the part of the "passive” defendant.
Neither defendant affirmatively indicated in his or her pretrial statements that the two adults had been continuously together during the entire 2 Vi-hour interval. Moreover, it seems more likely than not that at least one of them would have left the room in which the baby was located at some point during the relevant period, if only to use the bathroom or the kitchen. Contrary to the People’s argument, it would not have been a "remarkable coincidence” if the shaking just happened to occur when the "passive” defendant left the room. Indeed, it is hardly a remarkable notion that a person inclined to abuse a child would wait until another adult who might interfere had left the room before acting.
Similarly, the fact that the Wongs attempted to exculpate themselves by offering various, patently false explanations for Kwok-Wei’s condition did not add materially to the People’s case against the "passive” defendant. At most, their clumsy and transparent exculpatory efforts reflected their guilty knowledge that a horrible crime had occurred in their apartment on the preceding night. Because these statements bore no relationship to the events that actually led to the infant’s death, they did not shed any light on the "passive” defendant’s actual role in that death.
*610 Finally, although the People argue otherwise, the size of defendants’ apartment also provides no basis for inferring the "passive” defendant’s awareness of the abusive acts. To be sure, the apartment had only one bedroom and the baby’s crib was placed directly against defendants’ own bed. It is also true, however, that the small apartment had at least three other rooms — a living room, a kitchen and a bathroom — where the "passive” defendant could go. In the absence of any evidence to show how, or at least where, the abusive acts had occurred and which room or rooms the two defendants had been in, there was no basis for the jury to infer that the "passive” defendant had actually witnessed the shaking — a form of abuse that would leave no visible exterior marks. It follows that any conclusion by the jurors that the "passive” defendant actually knew of the abuse would have to have been based on impermissible speculation.
In light of the foregoing, there is no sound factual basis on which to hold the person who did not actually shake the infant criminally responsible for the infant’s death. Similarly, the count charging both defendants with endangering the welfare of a child cannot be sustained because, with regard to the "passive” defendant, it too necessarily rests on the unproven premise that that individual was aware of the life-threatening situation in which the infant had been placed as a result of the violent shaking. Apart from the People’s medical-omission theory, the only other argument for holding the "passive” defendant guilty of the endangering count is the theory suggested by the Appellate Division majority, i.e., that the "passive” defendant was criminally culpable for knowingly permitting his or her spouse to tend to a crying child in a late-night situation that was likely to provoke abuse. The theory is premised on the evidence admitted at trial to demonstrate that other children entrusted to the Wongs’ care had also been abused.
The problem with relying on this theory is, quite simply, that it was not among the theories of liability that were submitted to the jury. Indeed, under the trial court’s charge, the evidence of prior incidents of abuse was admitted only for the limited purpose of rebutting a defense of accident or mistake.
Accordingly, we conclude that the convictions of both defendants must be reversed even though that conclusion means that one clearly guilty party will go free. The result in this *611 case is an especially difficult one because of the heinousness of the crime as well as the evident culpability of one of the two appealing parties. Nonetheless, we are duty bound to reverse these two defendants’ convictions because the alternative— incarcerating both individuals for a crime of which only one is demonstrably culpable — is an unacceptable option in a system that is based on personal accountability and presumes each accused to be innocent until proven otherwise.
Accordingly, the order of the Appellate Division should be reversed and the indictment against defendants dismissed.