■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DEBORAH POTTER, Appellant. [682 NYS2d 238] —Mikoll, J. Appeal from a judgment of the Supreme Court of Essex County (Jung, J.), rendered July 15, 1996, upon a verdict convicting defendant of the crimes of falsifying business records in the first degree (seven counts) and grand larceny in the second degree.

By its verdict convicting her of grand larceny in the second degree and seven counts of falsifying business records, a jury found that defendant, utilizing a sophisticated scheme involving fictitious computer entries, systematically stole funds in excess of $50,000 from her employer, the Mirror Lake Inn (hereinafter the Inn) in the Village of Lake Placid, Essex County). Defendant seeks reversal principally upon the ground that the trial evidence was legally insufficient to support the verdict. She also challenges certain evidentiary rulings made by Supreme Court, as well as its order of restitution in the amount of $142,276. The gist of defendant's arguments on appeal is that the prosecution failed to prove (1) that funds were in fact missing or stolen from the Inn, (2) that defendant stole any such funds, and (3) that defendant made any false computer entries in the records of the Inn.

At the outset, it is well to articulate the scope of our review,

particularly in view of defendant's suggestion that the "moral certainty" standard applies. It is well settled that in reviewing legal sufficiency of evidence, direct or circumstantial, our inquiry is "whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People" (*People v Williams*, 84 NY2d 925, 926; *see, People v Wong*, 81 NY2d 600, 608; *People v Trimm*, 252 AD2d 673). The "moral certainty" standard required of the fact finder in wholly circumstantial cases (and charged to the jury in this instance) does not pertain to appellate review (*People v Williams, supra*, at 926).

After a thorough review of the substantial record in this case, and upon application of the requisite standard of review, we conclude that the evidence was legally sufficient to sustain the jury's verdict. The People presented considerable evidence from which the jury could rationally conclude that defendant stole substantial sums of cash from the Inn and concealed the thefts through a complex scheme of manipulating the company's records with false entries to its computer system. By its very nature and design, the scheme was undetectable in the ordinary course of the Inn's business, and came to light only fortuitously after the Inn's owner applied for a business loan and was required in connection therewith to arrange for an independent audit of the Inn's books.

The Inn is a resort facility with gross sales in excess of $5 million per year in 1991 and 1992. Defendant was employed by the Inn from 1986 to November 1992. Initially hired as a desk clerk, she rapidly ascended within the ranks to a management position. During the relevant periods, she managed the Inn's sales department and front desk area, supervising the employees working therein. Edwin Weibrecht, owner of the Inn, testified that defendant was one of his most valued and trusted "key" employees. In 1988, he delegated to her the task of designing, selecting and implementing a new computer system for the Inn. Thereafter, she was the employee with the most knowledge and control over the system, with other employees frequently consulting her with respect to problems they encountered using the computer system.

In the fall of 1992, certified public accountant Douglas Hoffman began preparations for the audit required in connection with the loan being negotiated by Weibrecht.[1] In the course of his examination of the Inn's records, he found a fairly regular

---

1. No audit of the Inn's books had been conducted since the mid-1980s.

pattern of questionable negative entries on the Inn's daily transaction sheets. These negative transactions purported to represent credits or refunds to guests, in the form of cash, checks or credit card vouchers. Upon further investigation, however, the entries were determined to be false, i.e., they did not in fact represent credits actually paid or given to guests. Therefore, although the total revenues reflected in the daily transaction sheets always balanced with the day's receipts, in reality, cash was missing. The effect of the false entries was to create the appearance of balance between the day's total receipts and the amount of cash ultimately received and deposited by the Inn. Because the entries were false, they concealed cash shortages in amounts corresponding to their total.

Contrary to defendant's contention that the People failed to prove that funds were in fact missing or stolen, this fact was established by proof that the negative entries did not correspond to actual credits paid or given to customers. The falsity of the entries was established through testimony of various witnesses. When a credit or refund was issued to a guest in the normal course of operations, a number of incidents would be present. First and foremost, the Inn's records would reflect that the guest had in fact visited the Inn and incurred charges as to which the refund or credit was being issued. Second, the ostensible credit reflected on the computer sheet would be implemented by the issuance of a "hard copy" of a credit to a credit card, the issuance of a refund check or a cash "paid out" slip. Hoffman and the Inn's comptroller testified that as to each questionable negative transaction, they searched for, but did not find, any record of the purported guest's stay at the Inn or the incurring of corresponding charges in the first instance. Moreover, they found no "hard copies" of credit card vouchers, refund checks or cash "paid out" slips, nor were the issuance of any credit card credits reflected on the Inn's bank statements.

While the People's case implicating defendant in the thefts and false entries was almost wholly circumstantial, it nonetheless comprised a considerable web of incriminating evidence. Significantly, after occurring regularly during 1991 and 1992, the negative entries ceased entirely after defendant left the Inn's employ in November 1992. None were found during the periods when defendant was absent from the Inn on vacation, although they occurred immediately before and after such absences. Although she did not ordinarily work in the front desk area, defendant was frequently seen there, particularly on Sunday mornings when checkout volume was the heaviest. She had unrestricted, unquestioned access to all areas of the Inn, including the safe and all aspects of the computer system.

A significant portion of the evidence circumstantially incriminating defendant derived from testimony and records pertaining to her financial dealings. State Police Investigator Gregory Schreffler conducted an exhaustive review of the financial records of defendant and her husband. His testimony and related documentary evidence established the following. The couple reported total income of $53,584.02 and $56,631 for the years 1991 and 1992 respectively. With the exception of a small amount of interest, their only reported source of income was wages. Schreffler collected and examined bank statements, deposit slips and other records pertaining to five bank accounts maintained by defendant. Four accounts were in joint name with her husband. A fifth account was opened by defendant, in her name alone and using the Inn's mailing address, on August 28, 1992. The account was closed on December 7, 1992, within two weeks of her termination from the Inn.[2] After identifying and categorizing the source of all deposits into these accounts for the years 1991 and 1992, e.g., paychecks and interest income, Schreffler found a total of $49,224, in the form of 140 separate cash deposits, that could not be traced to any reported income source or transfer between accounts. In addition, Schreffler's investigation also revealed that defendant had paid for several substantial expenditures, including airline tickets and home improvements totaling over $3,500, with either cash or bank checks, for which no corresponding withdrawals existed.

Further, two Inn employees under defendant's supervision testified that defendant gave them cash "bonuses" which she directed that they neither disclose nor discuss with anyone. Elizabeth McFadden testified that defendant gave her $2,500, in the form of five weekly $500 cash payments, which on each occasion she observed defendant remove from the Inn's safe. Bridget Stueley-Draper received a $350 payment immediately prior to leaving the Inn's employ. Neither "bonus" was included in the employee's wage and tax statement. Weibrecht testified that the payment of bonuses was a matter upon which his knowledge and authority was essential, and that in no event would bonuses ever be paid in cash. He specifically denied authorizing bonuses for McFadden and Stueley-Draper, and no records pertaining to these cash payments were ever found. Stueley-Draper also testified that she reserved a room at the Inn in 1992 for a personal function and was told by defendant that she did not have to pay for the room. Upon checking the computer, Stueley-Draper saw a "cash" payment for the room.

---

**2.** Significantly, defendant did not disclose this account on a loan application dated September 10, 1992.

The testimony also established that defendant, in direct contravention of instructions from Weibrecht, entered into a contract with a public relations firm for advertising and promotion. Defendant made payments on this contract totaling $5,250 using bank drafts, personal money orders or checks drawn on her individual checking account. Testimony and correspondence in the record reveal that defendant sought to conceal the contract and her personal payments thereon from Weibrecht and other Inn personnel, and enlisted Sharon Burstein to aid in the deception.

Turning briefly to the evidentiary rulings of which defendant complains, we find no error in the receipt of the exhibits in question. People's exhibit Nos. 2 and 3 were summaries, by month and dollar amount, of the negative transactions identified by Hoffman and Piilani Jaques. The computer printouts upon which these summaries were based were received into evidence as People's exhibit No. 1 and consisted of over 350 pages of posted revenues and credits. Summaries of voluminous records are admissible as long as the opposing party is provided with the original data (see, Guth Realty v Gingold, 34 NY2d 440, 446; see also, Prince, Richardson on Evidence § 10-107, at 726-727 [Farrell 11th ed]).

People's exhibit No. 4 was a chart prepared by Hoffman to illustrate, using a hypothetical transaction, how negative computer entries could be used to conceal the removal of cash without creating a discrepancy between the total posted revenue and the actual total. In permitting the exhibit, Supreme Court noted the inherent difficulty in understanding accounting terminology and deciphering complex financial records, and the relative ease of comprehending a model transaction with a simplified chart. The jury was instructed that the figures were hypothetical and that the exhibit did not relate to a transaction of which defendant was accused. The use of visual aids to assist the jury is permitted (see, People v Miller, 106 AD2d 787, 789).

On the question of restitution, defendant presses the same arguments as she unsuccessfully advanced upon the merits of the appeal. Supreme Court conducted a three-day restitution hearing, receiving numerous exhibits and voluminous records into evidence, and found that the People met their burden of establishing, by a preponderance of the evidence, that the victim is entitled to restitution. However, and as conceded by the People, the court erred in adopting figures compiled by the Inn's comptroller without adjusting the totals to reflect at least one error to which she testified on cross-examination. We note

that the comptroller specifically acknowledged one error in the amount of $900, and we are unable to ascertain from the record whether this is the only error or whether further adjustments are warranted. We therefore remit the matter for the sole purpose of enabling Supreme Court to fix the restitution amount consistent with the evidence.

Cardona, P. J., Mercure, Peters and Carpinello, JJ., concur. Ordered that the judgment is modified, on the law and the facts, by reversing so much thereof as calculated defendant's restitution; matter remitted to the Supreme Court for a new determination as to the proper amount of restitution, and for further proceedings pursuant to CPL 460.50 (5); and, as so modified, affirmed.