

FILED

Mar 19 2018, 5:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.,
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jennifer Schooler,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | March 19, 2018<br><br>Court of Appeals Case No.<br>69A01-1706-CR-1254<br><br>Appeal from the Ripley Circuit Court<br><br>The Honorable Ryan King, Judge<br><br>Trial Court Cause No.<br>69C01-1607-MR-001 |

**Vaidik, Chief Judge.**

[1] Jennifer Schooler was convicted of murder and Level 6 felony neglect of a dependent for killing her boyfriend's three-year-old son and failing to seek medical treatment for him, and the trial court sentenced her to maximum and consecutive sentences. Schooler now appeals, arguing that the evidence is insufficient to prove that she is the one who caused the three-year-old's fatal

brain injuries and that her sentence is inappropriate. Concluding that the evidence is sufficient to show that Schooler is the one who inflicted the three-year-old's fatal brain injuries and that her sentence is not inappropriate, we affirm.

## Facts and Procedural History

[2] The evidence most favorable to the verdicts is that in August 2015, Schooler and Thomas Chadwell were dating and lived together in an apartment in Batesville along with Chadwell's children, three-year-old Bradyn and ten-year-old Cheyenne. The children's mother, Amanda Chadwell, was incarcerated on theft and burglary charges in Carroll County, Kentucky, where she had been since May 14, 2015. Chadwell worked five to seven days a week at a factory in Greensburg, and Schooler watched the children, particularly Bradyn, who was not yet in school, while Chadwell worked. According to Schooler, she took care of Bradyn and Cheyenne "twenty-four-seven." Tr. Vol. III p. 46.

[3] Wednesday, August 12 was a school day for Cheyenne. When she woke up that day, Bradyn was already playing with his blocks. As Cheyenne walked outside to wait for the bus, she told Bradyn, "Bye, I love you bubby." Tr. Vol. IV p. 61. Bradyn responded, "Bye, Shine," which was what he called Cheyenne because he could not say her name. *Id.* According to Cheyenne, there was nothing "out of the ordinary" or "weird" with Bradyn when she left. *Id.* She then got on the bus and went to school "like every other day." *Id.*

[4]     Schooler, Chadwell, and Bradyn were all home together until 1:00 p.m., when Chadwell left for work. Beginning at 1:19 p.m., Schooler called Chadwell several times; the phone calls between them totaled about nine minutes. Tr. Vol. III p. 153. Schooler called 911 at 1:34 p.m.

[5]     According to the 911 call, Schooler reported that there was a three-year-old "not breathing" on "the bedroom floor." Exs. 6 (transcript of 911 call) & 11 (recording of 911 call); Tr. Vol. III pp. 237-38. Schooler initially told the 911 dispatcher that she "just got [Bradyn] out of bed." Exs. 6 & 11; Tr. Vol. III p. 238. Schooler then said that Bradyn "hit his head on the, on the side of the dr-dresser, er, the fish tank thing" and went unresponsive. Exs. 6 & 11; Tr. Vol. III p. 239. The 911 dispatcher told Schooler to perform CPR and provided step-by-step instructions. In the meantime, at 1:35 p.m., Ripley County EMS received a call about "a three year old child not breathing." Tr. Vol. II p. 228. Paramedic April Jarrett and her partner (who was an EMT) arrived at the apartment at 1:38 p.m. Because of the nature of the call, a second paramedic in a chase truck also responded. Schooler was still on the phone with the 911 dispatcher counting chest compressions out loud when EMS arrived, and she can be overhead telling EMS that Bradyn was talking "[a] few minutes ago" and then "he just fell over." Exs. 6 & 11; Tr. Vol. III p. 241. When EMS asked Schooler about Bradyn's history, she responded that "his mother is in jail for child abuse" and mentioned that his mother had a "metal paddle in the car." Exs. 6 & 11; Tr. Vol. III pp. 241-42. Schooler then elaborated that Bradyn's mother had custody of him "since birth" and that they just got Bradyn from her

"[y]esterday." Exs. 6 & 11; Tr. Vol. III p. 242. She said that Bradyn was "dehydrated" when they got him. *Id.* EMS asked Schooler if Bradyn had the bruises on his face "whenever he c[a]me back from mom," and Schooler responded yes. *Id.* Finally, EMS asked Schooler if Bradyn fell "today," and Schooler responded, "No, when [Bradyn's mother] had him." *Id.*

[6] According to Jarrett, when she first walked into the apartment, she saw "[Bradyn] laying on the floor" in the living-room area (not the bedroom, like Schooler reported in the 911 call) about ten steps from the front door and Schooler "kneeling next to him." Tr. Vol. II p. 230. Schooler was not performing CPR, although she was counting chest compressions out loud on the phone to the 911 dispatcher at that time. Tr. Vol. III pp. 6-7; *see also* Exs. 6 & 11 (Schooler counting out loud to the 911 operator as EMS entered the apartment and continuing to count after EMS entered). Jarrett immediately felt for a pulse on Bradyn. Finding none, the first responders started chest compressions to start his heart and used an "ambu bag" to get air into his lungs. Tr. Vol. II p. 232. Jarrett noted that Bradyn was "[b]lue-ish-gray" and had bruising on his face. *Id.* Jarrett asked Schooler what happened to Bradyn, and Schooler said that Bradyn had been "acting fine and was running around and playing." *Id.* However, he "hit his head on [the] fish tank about 15 minutes before [be]coming unresponsive." *Id.* at 233. Jarrett asked Schooler where Bradyn got the bruises, and Schooler responded that Bradyn had the bruises when they got him from his mother the Friday before (five days earlier). *Id.* at 239; Tr. Vol. III pp. 2-3.

[7] After extensive medical interventions by EMS, including delivering two doses of epinephrine directly into Bradyn's bone marrow, Bradyn finally had a pulse, although he still was not breathing on his own. EMS transported Bradyn to Margaret Mary Hospital in Batesville, arriving at 1:54 p.m. After a short stay at this hospital, EMS transferred Bradyn to the high school, where a helicopter picked him up at 2:17 p.m. to take him to Cincinnati Children's Hospital. During her treatment of Bradyn, when he was wearing only a diaper, Jarrett observed the following injuries to him: bruising on both cheeks resembling the shapes of fingers, a scratch above his left eye, a large bruise to his right eye, large bruises (yellow in color) to his left upper arm, bruising to the top inner thighs that were in varying stages of healing, a bruise the size of a silver dollar below his left shoulder blade, a bruise to his right lower flank area, and bruising to his upper center chest. Tr. Vol. III p. 2.

[8] Because of the seriousness of the 911 call, all available Batesville Police Department officers responded to the apartment, including Chief of Police Stanley Holt and Detective Blake Roope. Detective Roope then went to Margaret Mary Hospital, where he spoke with Schooler "within [an] hour of the 911 call" "while the details of that day [were] fresh in her mind." *Id.* at 25.

[9] During the interview, Schooler told Detective Roope that she was Bradyn's "primary caretaker." *Id.* at 29. She said that Bradyn woke up around 10 a.m., at which point she made him breakfast, an egg sandwich. She said there was "nothing out of the ordinary" with Bradyn that morning. *Id.* at 31. Schooler said that Chadwell left for work at 1:00 p.m. and that about forty minutes after

Chadwell left, Bradyn was chasing the cat when he tripped, fell, and hit the corner of his left eye on "the bottom left corner" of the fish-tank stand. *Id.* at 43. Schooler said that Bradyn got a small scratch on the corner of his left eye, which bled "a little." *Id.* at 36. She asked Bradyn if he was okay, and he nodded yes. However, about thirty minutes after the fall, Schooler said that Bradyn was sitting on the floor in the living-room area playing with the cat when he "slumped to his left side" with his eyes open. *Id.* at 38. She then laid him flat on his back. According to Schooler, she then called Chadwell to tell him that Bradyn had fallen and hit the fish-tank stand and that "something was wrong with [him]." *Id.* at 39. Schooler said that she spoke with Chadwell for "six seconds" and that he told her to call 911, which she immediately did. *Id.* at 40.

[10] Schooler also told Detective Roope about another injury to Bradyn. That is, a "couple of weeks" ago, Cheyenne accidentally knocked Bradyn over, causing him to hit the back of his head against a "floor heater" in the bedroom. *Id.* at 44. Schooler checked Bradyn's head but found "nothing." *Id.* According to Schooler, these were the only two accidents that could have injured Bradyn.

[11] Detective Roope then asked Schooler if she had ever spanked Bradyn, and she claimed that she had "never" spanked Bradyn—or any child for that matter— and specifically noted that Bradyn "was not a discipline issue." *Id.* at 47. She also said that she had never seen Chadwell spank Bradyn either. When Detective Roope inquired about the bruises on Bradyn's body, Schooler responded that Bradyn had been injured (including a bite to his finger and a

playground incident that resulted in a bruise to the left side of his forehead) while he was in the care of his mother, Amanda, and that Bradyn had these injuries when she and Chadwell got Bradyn from Amanda "two months" ago. *Id.* at 49. Detective Roope asked Schooler if she reported the injuries to the Department of Child Services, and Schooler said yes. However, Schooler could not remember the caseworker's name. Upon further questioning about the alleged DCS report, Schooler's timeline suddenly "shifted," and she claimed that they got Bradyn from Amanda two weeks ago (not two months). *Id.* at 50. Detective Roope later contacted DCS and confirmed that no report had been made. In any event, Detective Roope asked Schooler what she thought was wrong with Bradyn, and she opined that he was dehydrated and malnourished "from when [Amanda] had him." *Id.* at 55.

[12] After interviewing Schooler at Margaret Mary Hospital, Detective Roope returned to the apartment to investigate the scene. He found a large, broken wooden spoon on the floor inches away from Bradyn's toy box. In light of this discovery, Detective Roope went to Cincinnati Children's Hospital, where Bradyn had since been airlifted, to speak with Schooler again. Around 6:00 p.m., he interviewed Schooler for a second time that day. Detective Roope asked Schooler about the broken wooden spoon on the floor, and she said that two days ago she threw the spoon at the cat, who was trying to eat Bradyn's food as he sat by the toy box, and that the spoon broke. When Detective Roope revisited the topic of Bradyn's injuries, Schooler mentioned injuries that she had not talked about before, specifically "bruising around his buttocks region" and

"a bruise on [his] thigh." *Id.* at 63. Schooler again claimed that these injuries occurred to Bradyn while he was in Amanda's care; however, this time she claimed that they got him from her "two months" ago. *Id.* at 64. Schooler reiterated her earlier statement that neither she nor Chadwell had ever struck Bradyn.

[13] At Cincinnati Children's Hospital, Dr. Robert Shapiro, who specializes in child-abuse cases and is the director of the hospital's Mayerson Center for Safe and Healthy Children, saw Bradyn in the intensive-care unit. Bradyn was "comatose" and on "life support." Tr. Vol. V p. 22. Dr. Shapiro noted the same bruises to Bradyn that EMS had seen, and x-rays showed that Bradyn had several broken bones—including a broken rib, a broken finger, and two broken hands—in various stages of healing. Bradyn was also malnourished. However, Bradyn's most critical injury was bleeding in his brain. A CT scan revealed that Bradyn had "significant bleeding in the subdural and subarachnoid spaces" of his brain, which caused "his brain to shift and to herniate" into the base of his skull (and which likely caused Bradyn to stop breathing). *Id.* at 61-62. Bradyn also had "extensive" retinal hemorrhaging, or bleeding in the eyes. *Id.* at 64.

[14] On Friday, August 14, officers with the Batesville Police Department went to Cincinnati Children's Hospital to document Bradyn's injuries. With Bradyn's diaper removed, they spotted a pattern of bruising consisting of small, polka-dotted circles on his bottom. The officers connected this unique pattern to a metal strainer spoon (which had small holes in the scoop) that had been collected from the apartment.

[15]   Also on August 14, testing showed that Bradyn had experienced a "brain death." Ex. Vol. IX ("Page 800" of medical records). He was removed from life support and passed away.

[16]   Dr. Karen Looman, the chief deputy coroner at the Hamilton County (Ohio) Coroner's Office, conducted an autopsy the following day. She observed "a large volume of bruising" in different colors all over his body, which suggested that the bruises were of different ages. Tr. Vol. IV p. 95. According to Dr. Looman, a bruise typically disappears after seven to ten days, and there is no bruising after two months. Dr. Looman also took x-rays of Bradyn's body and confirmed that he had fractures, including a healing fracture to his rib (which was about one month old) and a broken finger. As for the injuries to Bradyn's brain, Dr. Looman said that he had "a lot of trauma to his head," including subgaleal hemorrhages (bruising under his scalp), subdural hemorrhages, subarachnoid hemorrhages, and retinal hemorrhages. *Id.* at 124; Ex. Vol. IX (coroner's final autopsy report dated November 9, 2015). Bradyn's brain was also "badly swollen." Tr. Vol. IV p. 109. Dr. Looman concluded that the cause of Bradyn's death was complications of non-accidental trauma to the head. Ex. Vol. IX (coroner's final autopsy report dated November 9, 2015).

[17]   After receiving the preliminary autopsy results, Chief Holt interviewed Schooler and Chadwell on August 17. During the first interview, Schooler essentially repeated everything that she had told Detective Roope. She also said that Bradyn was basically non-verbal and communicated by nodding his head and that she had been his primary caretaker since May 2015. Tr. Vol. III p. 218.

Chief Holt then changed his strategy, telling Schooler that their investigation up to that point showed that she was responsible for Bradyn's injuries. But when Schooler still did not say anything different than before, Chief Holt left the room to interview Chadwell. After interviewing Chadwell, Chief Holt returned to Schooler. At this point, Schooler's story slowly started to change. At first, she admitted spanking Bradyn with her hand—despite her previous claims that she had never spanked any child. Then, she "admitted that she was spanking him with a spoon" "on the butt." Tr. Vol. III pp. 230-31. She said that Bradyn reacted to the spankings by putting his hands "on his butt" to protect himself. *Id.* at 231. Schooler said that when she noticed that the spankings were "starting to leave bruising and that it was hurting his hand," she quit. *Id.; see also* Tr. Vol. IV p. 48. Chief Holt asked Schooler if it was possible that Bradyn had experienced an additional injury to this head (besides falling into the fish-tank stand and floor heater), and Schooler—for the first time—said that about two days before August 12, she lightly pushed Bradyn away from her after spanking him, at which point he "went down and smacked his head into the side of the coffee table." Tr. Vol. III pp. 232, 234. Although Schooler indicated that she had lightly pushed Bradyn away from her, she also said that Bradyn hit his head "pretty hard" and was "hurt pretty bad." *Id.* at 232. Chief Holt noted that Schooler was "slowly admitting more and more what she did," although she was still "trying to somewhat minimize things" so that she did not look "too bad." *Id.* at 233. When Chief Holt asked Schooler why she spanked Bradyn that time, she answered because Bradyn had called Cheyenne "a whore." *Id.* at 235. This didn't make "a lot of sense" to Chief Holt because

Schooler had just told him that Bradyn was non-verbal. *Id.* Schooler was arrested following this interview.

[18] The State ultimately charged Schooler with murder, Level 1 felony neglect of a dependent resulting in death, and Level 1 felony aggravated battery. A jury trial was held in January 2017. The State presented the testimony of numerous witnesses, including Cheyenne, Dr. Shapiro, Dr. Looman, and Detective Roope. Cheyenne testified that she had witnessed Schooler "whoop[]" Bradyn when "he had accidents in his diaper" and that Schooler would use "a metal spoon and a wooden spoon." Tr. Vol. IV p. 63. Cheyenne then identified the metal strainer spoon recovered from the apartment as the one that Schooler used on Bradyn. Cheyenne explained that Schooler would hit Bradyn "[o]n his butt" and that if his hands were in the way, "they would get whooped too." *Id.* According to Cheyenne, Chadwell never hit Bradyn with anything. *Id.* at 64.

[19] Dr. Shapiro testified that Bradyn's injuries were not caused by falling into a fish-tank stand, a heater, or a table—all possibilities that Schooler had claimed. Rather, Bradyn's injuries were caused by "multiple severe impacts to his head" in that "his head was struck against an object multiple times." Tr. Vol. V p. 70; *see also id.* at 72 (Dr. Shapiro clarifying that he didn't think "something was used to strike [Bradyn's] head; rather, it was "more likely that his head was struck against a[n] object"). Dr. Shapiro also thought that it was "likely that he was also shaken" given the bruises to his upper arms and his small size. *Id.* at 70; *see also id.* at 94-95 (Dr. Shapiro confirming that shaking was "a real possibility"). Finally, Dr. Shapiro said that Bradyn would have started exhibiting symptoms

"within minutes" to two hours of his head injury. *Id.* at 85; *see also id.* at 95 (Dr. Shapiro affirming that symptoms could "show up in minutes" of the injury).

[20] Dr. Looman testified that Bradyn's brain injury occurred on August 12 and that it was caused by "violent trauma." Tr. Vol. IV pp. 110, 130. Like Dr. Shapiro, Dr. Looman testified that Bradyn's injuries were not caused by falling into a fish-tank stand, a heater, or a table, either individually or collectively. *Id.* at 126. Rather, Dr. Looman believed that the injuries to Bradyn's brain occurred from "a violent shake, a violent twist," or "some sort of violent impact" "right around the time when [he] collapsed" on August 12. *Id.* at 135; *see also id.* at 126 ("I'm telling you what happened around the time he went unresponsive at home is what caused this serious injury to his head."). Dr. Looman said that blood could have started accumulating in Bradyn's brain as quickly as five to fifteen minutes "following an impact." *Id.* at 133, 135.

[21] Finally, Detective Roope testified that although both Schooler and Chadwell were suspects at the beginning, after "a long investigation" his attention turned to Schooler only. Tr. Vol. III p. 78. He based this on the inconsistencies in Schooler's 911 call, the fact that Schooler was with Bradyn "twenty-four seven," and the fact that the medical evidence did not support Schooler's version of what happened to Bradyn. *Id.*

[22]     Schooler's defense theory was that Chadwell caused the fatal brain injury to
Bradyn.[1]  During closing argument, defense counsel highlighted the following
evidence to support that theory: (1) Chadwell was at the apartment only twenty
minutes before Bradyn collapsed;  (2) Chadwell told inconsistent stories about
whether Bradyn was awake or asleep when he left for work on August 12; (3)
after Schooler called Chadwell to tell him that something was wrong with
Bradyn, Chadwell stopped on his way home to get gas and also bought a drink
for himself; and (4) Chadwell had recently taken out life insurance on Bradyn
and tried to collect on it.  The State responded to defense counsel's theory as
follows:

> [Schooler] never ever pointed a finger at Thomas Chadwell.  Not
> once.  Not within minutes on 911, not within minutes to the
> paramedics, not within hours to [Detective Roope], not within
> five (5) days to Chief Holt, not once did she say, "He did it.  He's
> the one.  He's the one that shook him.  He's the one that
> slammed his head down."  Not one time.  And now we're over
> five hundred (500) days later.

Tr. Vol. V p. 175.  The jury found Schooler guilty as charged, and the court
entered judgments of conviction on all counts.

[23]     At sentencing, the trial court vacated the Level 1 felony aggravated-battery
conviction and reduced the neglect-of-a-dependent conviction from a Level 1

---

[1] The State charged Chadwell with Level 6 felony neglect of a dependent, which was pending at the time of
Schooler's trial.  Chadwell later pled guilty and was sentenced to 750 days.

felony to a Level 6 felony due to double-jeopardy concerns. Appellant's App. Vol. VI p. 57. In a seven-page sentencing order, the trial court identified eight aggravators: (1) Bradyn was only three years old, still in diapers, and essentially non-verbal; (2) Bradyn's death caused significant psychological and emotional trauma to Cheyenne; (3) Schooler was Bradyn's primary caretaker, and he was dependent on her; (4) the nature of the crimes in that the cause of Bradyn's death involved "a repetition of traumatic events"; (5) the harm suffered went far beyond that required to prove murder in that Bradyn had numerous fractures and bruising all over his body; (6) Schooler "attempted to avoid accountability by blaming a demonstrably innocent mother for the death of that mother's own three year old child"; (7) Schooler's character indicates that she is likely to re-offend because she previously "had her parental rights to [her own] five (5) children terminated"; and (8) Schooler has a criminal history consisting of one misdemeanor conviction and a pending probation violation (although Schooler argued that her criminal history was a mitigator, the court found that it was "slightly more aggravating than mitigating" but did not carry much weight). *Id.* at 59-61.

[24] As for mitigators, Schooler claimed that the trial court should consider her difficult upbringing. The court found that to the extent her upbringing was a mitigator, it "lack[ed] any meaningful weight" given that her hardship "has absolutely nothing to do with her jury conviction for murdering a three year old when she was thirty-three (33) years of age." *Id.* at 61. Schooler also argued that the fact that Chadwell was charged in connection with this case should be a

mitigator. The court, however, found that Chadwell's pending charge was "not relevant" to Schooler's sentencing. *Id.* As for the fact that Schooler expressed remorse in her PSI, the court found her "newly found remorse" to be "a matter of convenience" and therefore not mitigating. *Id.* at 60. Concluding that the aggravators "significantly" outweighed the mitigators, the court sentenced Schooler to "the maximum sentence" for each offense—sixty-five years for murder and two-and-a-half years for neglect of a dependent—and ordered the sentences to be served consecutively, for an aggregate term of sixty-seven-and-a-half years. *Id.* at 62. Acknowledging that this was the maximum sentence possible, the court included the following observations at the end of its order to support its sentence:

> The Court appreciates that this sentence is the maximum sentence. The Court further understands that the maximum sentence is reserved for the worst offenders. The facts of this case show that the maximum sentence is appropriate: Defendant knowingly killed a three (3) year old child while the child was in her care, custody and control by inflicting overwhelming brain trauma thereby thrusting permanent emotional and psychological damage on the victim's ten (10) year old sister and thereafter showed no remorse for having done so. The additional facts that: Defendant has some criminal history and a pending probation violation; Defendant neglected her own children necessitating the termination of her parental rights; and Defendant inflicted additional significant bodily injury on Bradyn Chadwell affirmatively cement[] the Defendant as a worst of the worst offender.

*Id.* at 62-63.

Schooler now appeals.

# Discussion and Decision

Schooler raises two issues on appeal. First, she contends that the evidence is insufficient to support her murder conviction. Second, she contends that her maximum and consecutive sentences for murder and Level 6 felony neglect of a dependent are inappropriate.

# I. Sufficiency of the Evidence

Schooler contends that the evidence is insufficient to support her murder conviction because the State "failed to present sufficient evidence beyond a reasonable doubt that [she] was the person who inflicted a fatal injury upon [Bradyn]." Appellant's Br. p. 25. Instead, she claims that the facts show that Chadwell is the one who inflicted the fatal injury. When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* It is not necessary that the evidence "overcome every reasonable hypothesis of innocence." *Id.* (quotation omitted). The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007).

[28]     Schooler concedes that she is "one of the two individuals" "who could have injured [Bradyn]." Appellant's Br. p. 23. In addition, it is undisputed that Schooler was Bradyn's 24/7 caretaker and was home alone with him when he collapsed. Nevertheless, Schooler argues that "the fatal injury **could** have occurred" when Chadwell was still home. *Id.* at 21 (emphasis added). As support, she points to the testimony of Dr. Looman, wherein she acknowledged that Bradyn could have suffered the fatal brain injury anywhere from minutes before he went unresponsive up to the day before, i.e., when Chadwell was still home. Tr. Vol. IV pp. 134-35. Agreeing with Schooler on this point, however, would require us to ignore the evidence supporting the jury's verdict.

[29]     As the trial court recognized, the evidence did not show exactly what caused Bradyn's fatal brain injury. *See* Appellant's App. Vol. VI p. 59 ("Nobody, except the Defendant, may ever know which blow was the final blow."). However, the doctors agreed that Bradyn's brain injuries were not caused by falling into a fish-tank stand, a heater, or a table but rather by a violent impact. In fact, Dr. Shapiro opined that Bradyn's head was struck against an object multiple times. Although it was possible that Bradyn was injured hours before he collapsed, when Chadwell was home, Dr. Looman believed that the fatal injury occurred "right around the time when [Bradyn] collapsed," that is, just "minutes" before he went unresponsive on August 12. Tr. Vol. IV pp. 134-35. And although Dr. Shapiro testified that it was "very difficult to assign any type of timeline," Tr. Vol. V p. 89, he believed that Bradyn would have started exhibiting symptoms "within minutes" of his brain being injured, *id.* at 85.

Thus, the facts most favorable to the verdict support the conclusion that Bradyn's fatal brain injury occurred when Schooler, by her own admission Bradyn's "twenty-four-seven" caretaker, was the only person home with him.

[30] In any event, there is more evidence to support Schooler's conviction than just the fact that she was home alone with Bradyn when he collapsed. As laid out above, after Bradyn collapsed, Schooler didn't call 911 first; rather, she called Chadwell at 1:19 p.m. Fifteen minutes later, at 1:34 p.m., she finally called 911. Starting with the 911 call, the record is full of inconsistent and false statements given by Schooler. That is, Schooler told the 911 dispatcher that Bradyn was on the bedroom floor and that she "just" got him out of bed. She then said that Bradyn hit his head on the fish-tank stand and went unresponsive. Schooler's quick change in story prompted the 911 dispatcher to say, "I thought you . . . OK." Exs. 6 & 11; Tr. Vol. III p. 239. Schooler then said that she and Chadwell got Bradyn from his mother "yesterday" and that she was responsible for Bradyn's injuries. Amanda, however, had been in jail since the middle of May. When EMS arrived, Bradyn was not on the bedroom floor; rather, he was ten steps away from the front door in the living-room area. And although Schooler was counting out loud on the phone with the 911 dispatcher, when EMS entered the apartment Schooler was not performing CPR (although she continued to count over the phone). Schooler then told EMS that she and Chadwell got Bradyn from his mother five days ago.

[31] Schooler's inconsistent and false statements continued during her interviews with both Detective Roope and Chief Holt. For example, she said that she had

talked on the phone with Chadwell for only six seconds before calling 911; the evidence, however, shows that she talked to Chadwell multiple times for a total of approximately nine minutes and that she called 911 fifteen minutes after first calling Chadwell. She also gave varying accounts regarding when they got Bradyn from Amanda—e.g., yesterday, five days ago, two weeks ago, and two months ago—even though Amanda had been in jail for the past three months. In addition, Schooler claimed to have made a report to DCS about Amanda injuring Bradyn; however, Detective Roope confirmed that no such report had been made. Although Schooler first claimed that she had "never" spanked Bradyn, she later admitted to spanking him with her hand and finally admitted to spanking him with a spoon, leaving bruises. And it was not until her final interview with Chief Holt that Schooler mentioned a brand-new incident that had occurred a couple of days before August 12 in which she spanked Bradyn and pushed him, causing him to hit his head "pretty hard" on the coffee table. Moreover, at no point during the 911 call or any of her interviews did Schooler implicate Chadwell; in fact, she claimed the opposite—that Chadwell had never hit Bradyn. Likewise, Cheyenne testified that Schooler spanked Bradyn with wooden and metal spoons and that she had never seen her father do so. The jury heard this evidence, along with the evidence that Schooler believed showed

that Chadwell inflicted the fatal brain injury, and found Schooler guilty of murder.[2] The evidence is sufficient to support the jury's verdict.[3]

## II. Inappropriate Sentence

[32] Schooler next contends that her maximum sentence of sixty-seven-and-a-half years for murder and Level 6 felony neglect of a dependent is inappropriate. Indiana Appellate Rule 7(B) provides that an appellate court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Because we generally defer to the judgment of trial courts in sentencing matters, *Norris v. State*, 27 N.E.3d 333, 335-36 (Ind. Ct. App. 2015), defendants have the burden of persuading us that their sentences are inappropriate, *Thompson v. State*, 5 N.E.3d 383, 391 (Ind. Ct. App. 2014). "Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to

---

[2] Schooler argues that this case is analogous to *People v. Wong*, 619 N.E.2d 377 (N.Y. 1993). It is not. In that case, a husband and wife were convicted of second-degree manslaughter and endangering the welfare of a child for violently shaking a three-month-old infant in their care. The People's theory at trial was that only one of the defendants shook the baby while the other defendant, the "passive" defendant, stood by and failed to intervene. The court concluded that because there was no evidence tending to show which of the defendants was the "abusive actor," "the convictions of both defendants must be reversed even though that conclusion means that one clearly guilty party will go free." *Id.* at 381, 383. In this case, however, there is sufficient evidence showing that Schooler, the only one charged with Bradyn's murder, is the one who inflicted the fatal brain injury.

[3] Schooler makes additional arguments concerning her aggravated-battery and neglect convictions that are contingent on us reversing her murder conviction. However, because we are affirming Schooler's murder conviction, we do not address these arguments.

others, and a myriad of other factors that come to light in a given case." *Id.* (citing *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008)).

[33] Schooler concedes that Bradyn's death "is a horrible tragedy"; however, she continues to assert her "innocence" on appeal and claims that she only spanked Bradyn on the bottom with a wooden spoon and is not responsible for his brain injuries. Appellant's Br. p. 33. However, the jury found Schooler guilty of murder, and we have already found that the evidence is sufficient to support the jury's verdict. As the trial court explained in its sentencing order, Bradyn suffered "significant trauma" including "bruising on the head and brain," "bleeding on the brain," "significant swelling of the brain that squeezed brain matter into areas of the head not meant for brain matter," multiple fractures, and extensive bruising all over his body. Appellant's App. Vol. VI p. 59. We have looked at the photographs of the injuries to Bradyn, and they are gut wrenching and hard to look at. *See, e.g.*, Exs. 19-31. Furthermore, the court found that Schooler showed "an unparalleled cruel disregard for life" by failing to call 911 for at least fifteen minutes. Appellant's App. Vol. VI p. 59. The nature of the offenses is horrific and supports the maximum sentence in this case.

[34] As for Schooler's character, she points to her "difficult upbringing," "insignificant criminal history," and the fact that she "expressed sadness at [Bradyn's] death." Appellant's Br. p. 35. The trial court addressed all of these at sentencing. The court found that Schooler's upbringing was a mitigator but gave it very little weight given its lack of connection to a serious murder charge.

Although the trial court found Schooler's criminal history to be aggravating, it said that it was only "slightly more aggravating than mitigating." Appellants App. Vol VI p. 61. Finally, the trial court found that Schooler's "newly found" remorse (as exhibited by her statements in her PSI) was "a matter of convenience" and not "true genuine remorse." *Id.* at 60. But even considering these things in Schooler's favor, they do not overcome the horrific nature of the offenses and other undisputed, negative aspects of Schooler's character, including her "exceptionally deviant" character revealed by blaming "a demonstrably innocent mother for the death of that mother's own three year old child" and the fact that she "neglected her own children" and had her parental rights terminated, which reflects that she has "a definite propensity to abuse and neglect children." *Id.* at 60-61. Schooler has failed to persuade us that her maximum sentence is inappropriate.

[35] Affirmed.

May, J., and Altice, J., concur.